# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RICHARD J. TORNETTA, Individually and on Behalf of All Others Similarly Situated and Derivatively on Behalf of Nominal Defendant TESLA, INC., | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2018-0408-KSJM |
| ELON MUSK, ROBYN M. DENHOLM, ANTONIO J. GRACIAS, JAMES MURDOCH, LINDA JOHNSON RICE, BRAD W. BUSS, and IRA EHRENPREIS, | ) ) ) ) ) ) ) | |
| Defendants, and | ) ) | |
| TESLA, INC., | ) ) | |
| Nominal Defendant. | ) | |

## OPINION AWARDING ATTORNEY'S FEES AND DENYING MOTION TO REVISE THE POST-TRIAL OPINION

Date Submitted: August 2, 2024
Date Decided: December 2, 2024

Gregory V. Varallo, Daniel E. Meyer, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; Jeroen van Kwawegen, Margaret Sanborn-Lowing, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; Peter B. Andrews, Craig J. Springer, David M. Sborz, Jackson E. Warren, ANDREWS & SPRINGER LLC, Wilmington, Delaware; Jeremy S. Friedman, Spencer M. Oster, David F.E. Tejtel, FRIEDMAN OSTER & TEJTEL PLLC; Bedford Hills, New York; *Counsel for Plaintiff Richard J. Tornetta.*

David E. Ross, Garrett B. Moritz, Thomas C. Mandracchia, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Michael A. Barlow, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Wilmington, Delaware; Alex B. Spiro, Christopher D. Kercher, Jonathan E. Feder, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; Kathleen M. Sullivan, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Los Angeles, California; Daniel Slifkin, Vanessa A. Lavely, CRAVATH, SWAINE & MOORE LLP, New York, New York; *Counsel for Defendants*

*Elon Musk, Robyn M. Denholm, Antonio J. Gracias, James Murdoch, Linda Johnson Rice, Brad W. Buss, and Ira Ehrenpreis.*

Catherine A. Gaul, Randall J. Teti, ASHBY & GEDDES, P.A., Wilmington, Delaware; John L. Reed, Ronald N. Brown, III, Caleb G. Johnson, Daniel P. Klusman, DLA PIPER LLP (US), Wilmington, Delaware; William M. Lafferty, Susan W. Waesco, Ryan D. Stottmann, Miranda N. Gilbert, Jacob M. Perrone, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Rudolf Koch, John D. Hendershot, Kevin M. Gallagher, Andrew L. Milam, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Brian T. Frawley, Matthew A. Schwartz, SULLIVAN & CROMWELL LLP, New York, New York; *Counsel for Nominal Defendant Tesla, Inc.*

A. Thompson Bayliss, Adam K. Schulman, Eliezer Y. Feinstein, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Kristen R. Seeger, John M. Skakun III, Elizabeth Y. Austin, SIDLEY AUSTIN LLP, Chicago, Illinois; *Counsel for Special Committee of the Board of Directors of Tesla, Inc., Kathleen Wilson-Thompson.*

Christine M. Mackintosh, GRANT & EISENHOFER, P.A., Wilmington, Delaware; Joel Fleming, Amanda Crawford, EQUITY LITIGATION GROUP LLP, Boston, Massachusetts; *Counsel for Amicus Curiae Professor Charles M. Elson.*

Daniel A. Griffith, WHITEFORD, TAYLOR & PRESON LLC, Wilmington, Delaware; Johnathon E. Schronce, Steven M. Haas, James M. Lockerby, HUNTON ANDREWS KURTH LLP, Richmond, Virginia; *Counsel for Amicus Curiae Chamber of Commerce of the United States of America.*

**McCORMICK, C.**

This decision marks the trial-level denouement in a derivative suit asserting fiduciary challenges to the largest executive compensation award in the history of public markets—Tesla, Inc.'s 2018 award to Elon Musk.

In January 2024, the court issued a post-trial opinion finding that the award was subject to review under the entire fairness standard, the defendants bore the burden of proving entire fairness, they failed to meet their burden, and the plaintiff is entitled to rescission. The plaintiff's attorneys then petitioned for fees and expenses, which is typical in a derivative suit when the plaintiff prevails. Atypically for this court, the defendants responded by putting the rescinded compensation plan—the exact same plan that the post-trial opinion deemed a breach of the duty of loyalty—to a stockholder vote for the stated purpose of "ratifying" it. The defendants then moved to "revise" the post-trial opinion based on the stockholder vote, asking the court to flip its decision and enter judgment in their favor. This decision resolves the motion to revise and the fee petition.

The motion to revise is denied. The large and talented group of defense firms got creative with the ratification argument, but their unprecedented theories go against multiple strains of settled law. There are at least four fatal flaws. First, the defendants have no procedural ground for flipping the outcome of an adverse post-trial decision based on evidence they created after trial. Second, common-law ratification is an affirmative defense that must be timely raised, which means that, at a minimum, it cannot be raised for the first time after the post-trial opinion. Third, what the defendants call "common law ratification" has no basis in the common law—

a stockholder vote standing alone cannot ratify a conflicted-controller transaction. Fourth, even if a stockholder vote could have a ratifying effect, it could not do so here due to multiple, material misstatements in the proxy statement. Each of these defects standing alone defeats the motion to revise.

The fee petition is granted in part. The plaintiff's attorneys asked for $5.6 billion in freely tradeable Tesla shares. In a case about excessive compensation, that was a bold ask. To be sure, their methodology for calculating this figure is sound. Delaware courts award fees based on a percentage of the value of the benefit achieved, scaled to reflect the stage of the case, and adjusted for other factors. Applying this approach to rescission of a $55.8 billion compensation award results in an eye-popping figure. Yet, as the Delaware Supreme Court cautioned in *In re Dell Technologies Inc. Class V Stockholders Litigation*, a fee award "can be so large that typical yardsticks, like stage of the case percentages, must yield to the greater policy concern of preventing windfalls to counsel."[1] The fee award here must yield in this way, because $5.6 billion is a windfall no matter the methodology used to justify it. To reach a reasonable number, this decision adopts the defendants' approach and uses the $2.3 billion grant date fair value to value the benefit achieved. Applying a conservative 15% to that figure results in a fee award of $345 million—an appropriate sum to reward a total victory. The defendants may elect to pay the fee award in cash or freely tradable shares.

---

[1] ---A.3d---, 2024 WL 3811075, at *7 (Del. Aug. 14, 2024) ["*Dell Appeal*"], *aff'g In re Dell Techs. Inc. Class V S'holders Litig.*, 300 A.3d 679 (Del. Ch. 2023) ["*Dell Chancery*"].

# I.     FACTUAL BACKGROUND

This factual background draws from multiple sources.  Portions come from the Post-Trial Opinion, which is incorporated by reference.[2]  Other portions rely on live testimony from the parties' expert witnesses and reports of both testifying and non-testifying experts.[3]  The description of the plaintiff's counsel's efforts comes from the plaintiff's counsel's affidavits submitted in support of the fee petition.[4]  Each side relies on events post-dating the Post-Trial Opinion, which was issued on January 30,

---

[2] C.A. No. 2018-0408-KSJM, Docket ("Dkt.") 294, *Tornetta v. Musk*, 310 A.3d 430 (Del. Ch. 2024) ("Post-Trial Op.").

[3] Dkt. 296, Affidavit of Daniel J. Taylor ("Taylor Aff."), Affidavit of Professor Ethan Yale ("Yale Aff."), Joint Declaration of Lucian Bebchuk & Robert J. Jackson, Jr. ("Bebchuk & Jackson Decl."); Dkt. 354, Affidavit of Professor David F. Larker in Support of Amy Steffens's Objection to Plaintiff's Motion for Award of Attorneys' Fees and Expenses, Affidavit of Professor Adam Pritchard in Support of Amy Steffens's Objection to Plaintiff's Motion for Award of Attorneys' Fees and Expenses ("Pritchard Aff."); Dkt. 358, Affidavit of Aaron Beckman in Support of Tesla's Opposition to Plaintiff's Counsel's Request for an Award of Attorney's Fees and Expenses ("Beckman Aff."); Dkt. 359, Expert Declaration of Steven R. Grenadier, Ph.D. in Support of Nominal Defendant Tesla's Answering Brief in Opposition to Plaintiff's Counsel's Request for an Award of Attorneys' Fees and Expenses ("Grenadier Decl."); Dkt. 360 Expert Declaration of Douglas J. Skinner in Support of Nominal Defendant Tesla's Answering Brief in Opposition to Plaintiff's Counsel's Request for an Award of Attorneys' Fees and Expenses ("Skinner Decl."); Dkt. 361, Declaration of Daniel R. Fischel in Support of Nominal Defendant Tesla's Answering Brief in Opposition to Plaintiff's Counsel's Request for an Award of Attorneys' Fees and Expenses ("Fischel Decl."); Dkt. 380, Ex. A, Declaration and Report of Steve Pomerantz, Ph.D. ("Pomerantz Decl.").

[4] Dkt. 296, Affidavit of Jeroen van Kwawegen in Support of Plaintiff's Application for an Award of Fees and Expenses ("Van Kwawegen Aff."), Affidavit of Peter B. Andrews in support of Plaintiff's Application for an Award of Fees and Expenses ("Andrews Aff."), Affidavit of Jeremy Friedman in support of Plaintiff's Application for an Award of Fees and Expenses ("Friedman Aff."); Dkt. 310 (Affidavit of Jeroen van Kwawegen in Support of Plaintiff's Bill of Costs), (Affidavit of Peter B. Andrews in Support of Plaintiff's Bill of Costs).

2024. Where the post-trial events are not subject to judicial notice, this decision lays out the parties' competing narratives for context only.[5]

### A. The Grant

On January 21, 2018, the Tesla Board of Directors (the "Board") held a special meeting to approve Musk's 2018 compensation award (the "Grant").[6] The Grant comprised 12 tranches, each of which would vest upon satisfaction of one market capitalization milestone and one operational milestone.[7] Each completed tranche provided Musk options to purchase shares equal to 1% of Tesla's outstanding common stock as of January 19, 2018.[8]

Fully vested, the Grant would provide Musk options to purchase 20,264,042 Tesla shares.[9] The strike price for each option was $350.02, representing the January 19, 2018 closing price.[10] Following a five-for-one stock split in 2020, and a three-for-one stock split in 2022, the total options conferrable under the Grant increased to 303,960,630, and the strike price for each of those options decreased to $23.33.[11]

---

[5] This decision also cites to the 2022 trial exhibits, Dkt. 221, Ex. A, by "JX" number, and the transcripts of the July 8, 2024, and August 2, 2024 oral arguments on the fee petition and motion to revise, respectively, Dkt. 407 ("7/8/24 Hr'g Tr.") and Dkt. 435 ("8/2/24 Hr'g Tr.").

[6] Post-Trial Op., 310 A.3d at 485.

[7] *Id.* at 486.

[8] *Id.* at 487.

[9] *Id.*

[10] *Id.*

[11] *Id.*

4

The February 8, 2018 Proxy Statement regarding the Grant disclosed a $55.8 billion maximum value and $2.6 billion grant date fair value ("GDFV").[12] Tesla ultimately recognized approximately $2.3 billion of employee stock-based compensation expenses in connection with the Grant in its audited financial statements for fiscal years 2018 through 2022.[13]

To approve the Grant, the Board adopted resolutions that: (i) "authorize[d] and reserve[d] sufficient shares of [Tesla] common stock for the issuance" of shares under the Grant, and (ii) "authorize[d] [Tesla] to issue and deliver, without further authorization of the Board, such number of shares of [Tesla] common stock as may be required to be issued pursuant to any vesting and exercise of any portion of the [Grant] in accordance with its terms, and upon such issuance, such shares shall be considered and treated as being in all respects validly issued, fully paid and nonassessable."[14]

Tesla instructed its transfer agent, Computershare Limited, to add to its share "reserve" an amount equal to the maximum potential future shares associated with the Grant.[15] A reserve is a bookkeeping entry meant to ensure that all possible future stock issuances under Tesla's contracts do not collectively cause Tesla to exceed its total number of authorized shares.[16] Tesla's approximately 400 million reserved

---

[12] *Id.* at 543.

[13] Skinner Decl. ¶ 11.e & n.6.

[14] JX-791 at 6.

[15] Beckman Aff. ¶¶ 7, 9, 17–18.

[16] *Id.* ¶ 7.

shares are a numerical count of the maximum number of shares that Tesla has agreed to potentially issue to employees or third parties under various contracts.[17]

Tesla achieved all market capitalization milestones and nearly all operational milestones. By April 29, 2022, 11 of the 12 tranches had vested and, as of June 30, 2022, all conditions sufficient for the final tranche to vest had been achieved.[18] By January 30, 2024, all options under the Grant were fully vested and in the money.[19] Musk never exercised the options.[20]

### B. The Litigation

Tesla stockholder Richard J. Tornetta ("Plaintiff") filed this action challenging the Grant on June 5, 2018.[21] Plaintiff brought suit against Musk and the Tesla directors who approved the Grant (the "Directors Defendants," with Musk, "Defendants"). Plaintiff claimed that Musk breached his fiduciary duties as a controlling stockholder and that the Director Defendants breached their fiduciary duties as directors. Defendants retained extremely capable counsel, and a knock-down, drag-out lawsuit ensued.

To understate matters, Plaintiff's litigation efforts were substantial. Plaintiff:

- Conducted a pre-suit investigation pursued under Section 220 of the Delaware General Corporation Law.[22]

---

[17] *Id.* ¶ 5.

[18] Post-Trial Op., 310 A.3d at 492.

[19] Dkt. 324, Ex. 2 ("Proxy Statement") at 139.

[20] Beckman Aff. ¶¶ 16–19; Proxy Statement at 142.

[21] Dkt. 1.

[22] *Id.* at 1–2.

- Prepared and filed the complaint.[23]

- Overcame a motion to dismiss, which required extended oral argument and supplemental submissions.[24]

- Undertook extensive fact discovery, which included: (i) serving four sets of document requests, five sets of interrogatories, and one set of requests for admission;[25] (ii) securing numerous amended and/or supplemented interrogatory responses;[26] (iii) serving subpoenas on twelve non-party entities and four non-party individuals;[27] and (iv) obtaining and reviewing hundreds of thousands of pages of documents.

- Prevailed on a motion to compel.[28]

- Took 17 fact depositions, several of which occurred over the course of multiple days.[29]

- Engaged in extensive expert discovery, exchanging initial expert reports (one from Plaintiff and three from Defendants) and rebuttal expert reports (three from Plaintiff and one from Defendants), deposing two experts, and defending the depositions of three.[30]

- Pursued and defended against a motion for summary judgment.[31]

- Filed an amended complaint over Defendants' objection.[32]

---

[23] *Id.*

[24] Dkts. 10, 12, 17, 29–31, 32; *Tornetta v. Musk*, 250 A.3d 793, 814 (Del. Ch. 2019) (denying motion to dismiss except as to waste claim).

[25] Dkts. 35–36, 74, 90, 98, 112.

[26] Dkts. 64, 70–73, 83–84, 95, 105, 116, 119, 134.

[27] Dkts. 37, 47, 57, 67, 67,78, 79, 80, 82, 127, 133, 216.

[28] Dkts. 104, 117, 120, 130–31.

[29] Dkts. 135, 140.

[30] Dkts. 141–42, 152; JX-1407; JX-1408; JX-1409; JX-1411; JX-1412.

[31] Dkts. 162–63, 184, 188, 194.

[32] Dkts. 161, 185, 193, 207, 209.

- Pivoted legal theories after the Delaware Supreme Court's decision in *Brookfield Asset Management, Inc. v. Rosson*.[33]

- Engaged in more expert discovery.[34]

- Negotiated a pre-trial order that included 255 stipulations of fact.[35]

- Geared up for trial, which required curating the trial exhibits, preparing witness examinations, and drafting pre-trial briefs.[36]

- Tried the case over the court of five days, martialing a record comprising 1,704 trial exhibits, eliciting live testimony from nine fact and four expert witnesses, and presenting video testimony from three fact witnesses and deposition testimony from 23 fact and five expert witnesses.[37]

- Submitted opening and answering post-trial briefs.[38]

- Presented post-trial argument.[39]

- Submitted supplemental post-trial briefing at the request of the court.[40]

The matter was fully submitted on April 25, 2023, when the parties filed the Joint Schedule of Evidence.[41]

---

[33] 261 A.3d 1251 (Del. 2021); Dkt. 175.

[34] Dkt. 214.

[35] Dkt. 243.

[36] Dkts. 221, 226–28.

[37] Post-Trial Op., 310 A.3d at 448 n.5; *see also* Dkts. 245–49.

[38] Dkts. 263–64, 274–75.

[39] Dkt. 284.

[40] Dkts. 285, 288–89.

[41] Dkt. 290.

## C.     The Court Orders Rescission.

Plaintiff achieved total victory.  In the Post-Trial Opinion issued January 30, 2024, the court ordered rescission of the Grant as a remedy for Defendants' breaches of the duty of loyalty.[42]

A few aspects of the Post-Trial Opinion warrant emphasis.  Contrary to how some have read the Post-Trial Opinion, the court did *not* find that the Board should have paid Musk nothing.  There were undoubtedly a range of healthy amounts that the Board could have decided to pay Musk.  Instead, the Board capitulated to Musk's terms and then failed to prove that those terms were entirely fair.  Also, the court did not declare that the legal theories of control applied in the Post-Trial Opinion were novel.  That is not what "boldly go" meant.  Rather, the bold move was applying those legal principles to Musk.  And the finding that Musk exercised transaction-specific control should have surprised no one; even Musk testified that he "negotiated against himself" during the process.[43]

## D.     The Mechanics Of Rescission

The parties agreed on the following facts relevant to rescission:

- The 303,960,630 options were fully vested.[44]

---

[42] Post-Trial Op., 310 A.3d at 497, 544.

[43] *Id.* at 66 & n.339.

[44] Dkt. 357 ("Defs.' Ans. Fee Br.") at 9 ("The total number of non-qualified stock options that could be granted if all 12 tranches vested was 303,960,630 at a strike price of $23.33 (after adjusting for two stock splits)."); *id.* at 12 ("[A]s of June 30, 2022, all . . . milestones had been achieved—conditions sufficient for the final tranche to vest."); Dkt. 296 ("Pl.'s Opening Fee Br.") at 15 (stating that the 303,960,630 options were vested).

- Musk had not exercised any of the options.[45]

- Based on the $191.59 per share closing price of Tesla stock on the date of the Post-Trial Opinion and the exercise (or strike) price of $23.33, the 303,960,630 vested options could have been exercised by Musk on a cashless basis for a total of 266,947,208 shares (rounded down).[46]

- Tesla did not issue any stock in connection with the Grant, and so rescission will not result in the return of any stock to Tesla's treasury.[47] Rather, rescission terminated Tesla's obligation to issue restricted stock and revoked Musk's right to exercise the options.[48]

- Rescission resulted in a reversal of the $2.3 billion accounting charge.[49]

The parties dispute the implications of these facts for the purpose of valuing the benefit achieved.

### E.    The Fee Petition

On March 1, 2024, Plaintiff's counsel filed a petition seeking 29,402,900 unrestricted shares of Tesla common stock in fees and $1,130,155.50 in reimbursement of expenses $1,120,115.50 (the "Fee Petition").[50]  Defendants opposed the Fee Petition.[51]

---

[45] Defs.' Ans. Fee Br. at 13 ("Musk did not exercise any options[.]"); Pl.'s Opening Fee Br. at 6 ("Musk has not exercised any of the options underlying the Grant.").

[46] Taylor Aff. ¶ 13.

[47] Beckman Aff. ¶ 19.

[48] *Id.* ¶ 21.

[49] Dkt. 387 ("Pl.'s Reply Fee Br.") at 18–23; Defs' Ans. Fee Br. at 6; Skinner Decl. ¶ 66.

[50] Pl.'s Opening Fee Br. at 11–12.

[51] *See* Defs.' Ans. Fee Br.  Several other persons describing their status as "objectors" also submitted briefs opposing Plaintiff's Fee Petition.  Those submissions are addressed in a separate Letter Decision.  *See* Dkts. 354, 374, 380, 402, 419.

### F. The Stockholder Vote

Less than an hour after the court issued the Post-Trial Opinion, Musk took aim at Delaware on social media.[52]  Seven hours after, Musk declared that Tesla would "move immediately to hold a shareholder vote to transfer state of incorporation to Texas."[53]

The Board acted promptly to implement Musk's redomestication proposal.  On February 10, 2024, the Board formed a special committee to consider the proposal.[54] On March 5, 2024, the Board expanded the committee's mandate to determine whether the Grant "should be ratified at the same time" as the stockholders consider the vote on redomestication.[55]  The Board appointed outside directors Kathleen Wilson-Thompson and Joe Gebbia to the committee.[56]  Gebbia, who allegedly has

---

[52]  Elon Musk (@elonmusk), X f/k/a Twitter (Jan. 30, 2024, 5:14 PM), https://twitter.com/elonmusk/status/1752455348106166598.  Board Chair Robyn Denholm waited until May to express her feelings on the record.  *See* Tabby Kinder and Stephen Morris, *Tesla's Chair on Elon Musk: "I Might Wake Up to a Tweet. I Don't Wake Up to a Strategy Shift"*, Financial Times, May 17, 2024, https://www.ft.com/content/aa5464fd-c7c5-4f38-a2df-374a07439d88 (last visited Nov. 25, 2024) (Denholm referring to aspects of the Post-Trial Opinion as "crap" and "absolute BS").

[53]  Elon Musk (@elonmusk), X f/k/a Twitter (Feb. 1, 2024, 12:09 AM), https://twitter.com/elonmusk/status/1752922071229722990.

[54] Proxy Statement at 18.

[55] *Id.* at 19.

[56] *Id.* at 18.

social ties to Musk,[57] later stepped down.[58] That left Wilson-Thompson to complete the task alone.[59]

As Defendants described in briefing, Wilson-Thompson reviewed 2,000 pages of documents as part of her evaluation (but 10% of those pages were the Post-Trial Opinion).[60] She also interviewed management and directors, among others. She completed the job in eight weeks.[61] According to Defendants, she met as a committee 16 times during that period.[62]

Concerned that Tesla would use the vote on redomestication to evade judgment in Delaware, Plaintiff filed four emergency motions.[63] In response, Tesla made statements intended to allay Plaintiff's concerns, including that the stockholder vote "[would] not affect any obligations or liabilities [Tesla] incurred prior to the conversion or the personal liability of any person incurred prior to the conversion, nor will it affect the choice of law applicable to [Tesla] with respect to matters arising

---

[57] Rebecca Elliott, Emily Glazer, Kirsten Grind & Coulter Jones, *The Money and Drugs That Tie Elon Musk to Some Tesla Directors*, Wall St. J., Feb. 3, 2024, https://www.wsj.com/tech/elon-musk-tesla-money-drugs-board-61af9ac4 (last visited Nov. 24, 2024); Rachel Levy, *Exclusive: Tesla Director Gebbia Says He Discussed Selling House to Musk*, Reuters, June 3, 2024, https://www.reuters.com/business/tesla-director-gebbiasays-he-discussed-selling-house-musk-2024-06-03/ (last visited Nov. 24, 2024).

[58] Proxy Statement at 19.

[59] *Id.*

[60] *Id.*

[61] *Id.* at 8 (stating Wilson-Thompson worked from May 8, 2024, to June 13, 2024).

[62] *Id.*

[63] Dkts. 308–11.

prior to the conversion."[64] The court denied Plaintiff's emergency motions based on Tesla's representations.

Tesla filed a Proxy Statement on April 29, 2024, recommending that stockholders "ratify" the exact same Grant rescinded by the Post-Trial Opinion.[65] The Proxy Statement identified a host of reasons why Tesla was seeking ratification, including that ratification would preclude Tesla's redomestication from being "wrongly perceived as being made in direct response to the *Tornetta* Opinion and with the intent to award Mr. Musk compensation in a different jurisdiction that he could not get in Delaware."[66] The Proxy Statement also noted that ratifying the Grant, instead of putting together a new pay package, could prevent the company from incurring a potential "accounting charge in excess of $25 billion."[67]

Tesla stockholders voted in favor of this proposal at Tesla's annual meeting on June 13, 2024 (the "Stockholder Vote").[68] Musk effectively declared victory before the polls closed.[69]

---

[64] *See* Dkt. 340 (Letter Decision); Dkt. 324 ¶ 3 (quoting Preliminary Proxy at 60).

[65] Proxy Statement at 90.

[66] *Id.* at 87.

[67] *Id.* The Proxy Statement says nothing about the tax consequences to Musk. *See* 8/2/24 Hr'g Tr. at 204:19–206:1.

[68] Tesla, Inc., Current Report (Form 8-K) (June 13, 2024), https://www.sec.gov/Archives/edgar/data/1318605/000110465924071439/tm2413800 d31_8k.htm.

[69] Elon Musk (@elonmusk), X f/k/a Twitter (June 12, 2024, 10:50 PM), https://twitter.com/elonmusk/status/1801084780035154058/photo/1 (Musk posting on X (Twitter) "[b]oth Tesla shareholder resolutions are currently passing by wide margins!" and attaching a chart displaying apparent vote totals).

## G. More Litigation

On the day it filed the Proxy Statement, Tesla lawyered up, adding five additional law firms to the list of attorneys representing Defendants in this lawsuit.[70]

On June 28, 2024, the Director Defendants filed a "Motion to Revise the Post-Trial Opinion" (the "Motion to Revise").[71] They argue that the Stockholder Vote had the effect of ratifying the Grant (the "Ratification Argument"). Tesla filed a joinder in support of the Motion to Revise, adding that the Stockholder Vote mooted this action.[72]

The court bifurcated consideration of the Fee Petition from the question of the effects, if any, of the Stockholder Vote.[73] The parties presented argument on the Fee Petition on July 8, 2024, and on the implications of the Stockholder Vote on August 2, 2024.[74]

---

[70] *See* Dkts. 305 (Richards, Layton & Finger, P.A.), 306 (DLA Piper LLP (US)), 307 (Morris, Nichols, Arsht & Tunnell LLP), 395 (Quinn Emanuel Urquhart & Sullivan, LLP), 318–20 (Sullivan and Cromwell).

[71] Dkt. 396.

[72] Dkt. 409.

[73] Dkt. 393.

[74] *See* 7/8/24 Hr'g Tr.; 8/2/24 Hr'g Tr. On July 22, 2024, the court granted motions for leave to participate as *amicus curiae* filed by non-parties the Chamber of Commerce of the United States and Professor Charles M. Elson, respectively. Dkt. 416 (Amicus Letter Decision); Dkt. 417 ("Chamber Amicus Br."); Dkt. 418 ("Elson Amicus Br."). The Chamber of Commerce argues that the amount sought in the Fee Petition is neither reasonable nor equitable and that large fee awards distort the incentives of the plaintiffs' bar and undermine the public policy underlying fee awards. Chamber Amicus Br. at 12–19. The Chamber urges the court to adopt additional procedural devices to reduce agency costs in derivative suits. *Id.* at 19–26. Professor Elson argues that the Stockholder Vote does not have the ratifying effect that Defendants claim. *See generally* Elson Amicus Br.

14

## II. LEGAL ANALYSIS OF THE RATIFICATION ARGUMENT

Tesla's Ratification Argument has evolved over the course of these proceedings. Tesla debuted the argument in the Proxy Statement, which described stockholder ratification as a powerful elixir that could cure fiduciary wrongdoing—not for those harmed by the wrongdoing, but for the wrongdoers. Tesla told stockholders that the Post-Trial Opinion got Delaware law wrong and that their vote would "*fix*" it.[75]  It stated that stockholder ratification can "*extinguish* claims for breach of fiduciary duty by authorizing an act that otherwise would constitute a breach."[76]  It reported that "the Company believes" that the doctrine could "cure" a whole host of maladies: "including disclosure deficiencies, procedural deficiencies, and breaches of fiduciary duty, identified by the Delaware court in connection with the Board and our stockholders' original approval of the 2018 CEO Performance Award."[77]

---

[75] In a letter to stockholders sent with the Proxy Statement, Board Chair Robyn Denholm stated: "*We* [presumably referring to the Board members] do not agree with what the Delaware Court decided, and we do not think that what the Delaware Court said is how corporate law should or does work.  So we are coming to you now so you can help *fix* this issue."  Dkt. 324, Ex. 2 ("Denholm Letter") at 3 (emphasis added).  In the same letter, Denholm told stockholders that the Post-Trial Opinion "struck down" and "second-guessed" their vote.  *Id.* at 2.  She stated: "[The Post-Trial Opinion] struck down one of your votes and rescinded the pay package that an overwhelming majority of you voted to grant to our CEO."  *Id.*  She also stated: "Because the Delaware court second-guessed your decision, Elon has not been paid for any of his work for Tesla for the past six years that helped to generate significant growth and stockholder value."  *Id.*  These statements are false.  The Post-Trial Opinion did not "strike down" or "second-guess" the stockholder vote.  Rather, it found that Defendants withheld material information from stockholders when soliciting that vote, and so Defendants could not benefit from a burden-shifting effect the stockholder vote might have otherwise had.

[76] Proxy Statement at 84 (emphasis added).

[77] *Id.* at 85.

15

Defendants appeared to retreat from this position in briefing and at oral argument. Defendants dropped the indefensible rhetoric of the Proxy Statement ("fix," "extinguish," "cure"), and asked the court instead to "vacate *the relief*" ordered by the Post-Trial Opinion. During oral argument, defense counsel made "very clear" what they were seeking, stating: "This motion does *not* seek to vacate the Court's factual findings or its legal conclusion. The *only relief* we are seeking at this point is that the Court modify the remedy set forth in the opinion."[78] By asking the court to vacate the relief alone, Defendants seemed to be narrowing their previously broad goals for ratification. But it was for appearances' sake only. Defendants also asked the court to enter an order stating: "Judgment is entered for Defendants on all counts."[79] So, the "only relief" sought by Defendants by the time of oral argument was to "modify the remedy" of rescission *and* flip the entire outcome of the case in Defendants' favor. That's all.

The substance of Defendants' argument did narrow in one way. Defendants initially relied both on Section 204 of the Delaware General Corporation Law and what they call the "common law doctrine" of ratification.[80] By the time they submitted their Reply Brief, however, Defendants had dropped the Section 204 argument and relied solely on the common law argument.[81]

---

[78] 8/2/24 Hr'g Tr. at 9:3–9 (emphasis added).

[79] Dkt. 396, Proposed Order ¶ 4; *see also* Defs.' Opening Ratification Br. at 52 (asking the court to "direct[] judgment for Defendants").

[80] Proxy Statement at 84; Defs.' Opening Ratification Br. at 3.

[81] Defs.' Reply Ratification Br. at 26; 8/2/24 Hr'g Tr. at 252:9–14.

16

As fully evolved, the Ratification Argument suffers at least four fatal defects.[82]

First, Defendants have no procedural ground for flipping the outcome of an adverse post-trial decision based on evidence they created after trial. Second, common-law ratification is an affirmative defense that must be timely raised, which means that, at a minimum, it cannot be raised after a post-trial opinion. Third, what Defendants call "common law ratification" has no basis in common law. Defendants argue that transactions resulting from breaches of the duty of loyalty can be put to a stockholder vote at any time for any purpose—including to extinguish already adjudicated claims or reverse the outcome of a court decision—because "stockholders hold the power to adopt any corporate acts they deem in their own best interests."[83] That statement is dubious generally and unquestionably false in the context of a conflicted-controller transaction. Fourth, even if the Stockholder Vote could have a ratifying effect on the Grant, it could not here due to multiple, material misstatements in the Proxy Statement concerning the effect of the vote. Each of these defects defeat the Ratification Argument.

## A. The Newly Created Evidence Is Procedurally Barred.

Defendants move to "Revise the Post-Trial Opinion" under two Court of Chancery Rules: Rule 54(b), governing judgment on multiple claims, and Rule 59(a),

---

[82] Because these four defects are enough to defeat the Ratification Argument, this decision does not reach the other criticisms advanced by Plaintiff and Professor Elson. *See, e.g.*, Dkt. 405 (Pl.'s Ans. Ratification Br.) at 44–46 (drawing on 8 *Del. C.* § 102(b)(7)(i) to support his position); *id.* 48–56 (arguing that the Stockholder Vote was coerced); and Elson Amicus Br. at 7–9 (arguing that ratification of the Grant was a gift that would require a unanimous vote).

[83] Defs.' Opening Ratification Br. at 14; *see also id.* at 16, 18, 23, 26.

governing new trials. During oral argument, Defendants also argued that they had met the standard under Rule 60(b) governing relief from judgment order.[84] The rules of procedure governing what evidence can be admitted post-trial speak to "two important values: the integrity of the judicial process and the finality of judgments. The rules exist to serve the first; their administration must acknowledge the second."[85]

Of the rules on which Defendants rely, Rule 59(a) and Rule 60(b) allow the court to reopen the trial record for the purpose of considering newly *discovered* evidence (*i.e.*, evidence "in existence at the time of trial" but hidden or unknown), not newly *created* evidence (*i.e.*, evidence not "in existence at the time trial").[86] The Stockholder Vote did not exist at the time of trial. Defendants created it after the

---

[84] There are two other Court of Chancery Rules governing post-judgment relief. They are Rule 59(e), which allows a party to move to alter or amend judgment within ten days of judgment, and Rule 59(f), which allows a party to move for reargument within five days the court's opinion. But Defendants do not invoke these rules because the deadlines for filing motions under Rules 59(e) and 59(f) passed before the Stockholder Vote. Ct. Ch. R. 59(e); Ct. Ch. R. 59(f).

[85] *Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, 1996 WL 757274, at *1 (Del. Ch. Dec. 20, 1996) (cleaned up).

[86] *Lebanon Cnty. Emps.' Ret. Fund v. Collis*, 2023 WL 2582399, at *7 (Del. Ch. Mar. 21, 2023), *rev'd on other grounds*, 311 A.3d 773 (Del. 2023) (finding "'new' as opposed to 'newly discovered' evidence" inadmissible post-trial); 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* (3d ed.) § 2808 ("[T]o comply with Rule 59, the court must find that the newly discovered evidence itself, as well as the facts that it supports, *were in existence at the time of trial*." (emphasis added)); *Bachtle v. Bachtle*, 494 A.2d 1253, 1255 (Del. 1985) (holding that, "to qualify as 'newly discovered evidence,' it must have been 'in existence and hidden at the time of judgment'" (citation omitted)).

Post-Trial Opinion. Thus, Rules 59(a) and 60(b) do not permit the court to consider the Stockholder Vote.

Perhaps for this reason, Defendants urge the court to apply the more movant-friendly standard of Rule 54(b). But Rule 54(b) is a poor fit at this procedural posture. In the typical case where a court admits new evidence under Rule 54(b), the prior judgment did not contain factual findings.[87] The lone case cited by Defendants for the Rule 54(b) standard, *Southpaw*, illustrates this point.[88] There, the court invoked Rule 54(b) to vacate an order dismissing the case,[89] where the vacated order expressly stated: "The Court has made no findings of fact with respect to any assertions in the litigation."[90]

The Post-Trial Opinion, by contrast, *completed* fact finding and resolved all claims and defenses timely raised. The Post-Trial Opinion left unaddressed one issue only—attorney's fees. In the context of representative litigation, the Delaware Supreme Court has held that "[a] judgment on the merits is not final until an application for an award of attorneys' fees has been decided."[91] This rule is motivated

---

[87] *See, e.g.*, *Southpaw Credit Opportunity Master Fund, L.P. v. Roma Rest. Hldgs., Inc.*, 2017 WL 3701232 (Del. Ch. Aug. 22, 2017) (vacating order that expressly contained no factual); *Fayetteville Inv'rs v. Comm. Builders, Inc.*, 936 F.2d 1462 (4th Cir. 1991) (permitting new evidence under Rule 54(b) for the purpose of modifying an order dismissing the complaint).

[88] *See* Defs.' Opening Ratification Br. at 12–13 (citing *Southpaw*, 2017 WL 3701232).

[89] *Southpaw*, 2017 WL 3701232, at *1.

[90] *Southpaw Credit Opportunity Master Fund, L.P. v. Roma Rest. Hldgs., Inc.*, 2017 WL 2362839, ¶ 7 (Del. Ch. May 30, 2017) (ORDER).

[91] *Klein v. Blue Valley, LLC*, 305 A.3d 351, 2023 WL 6159617, at *1 (Del. Sept. 20, 2023) (TABLE) ("This Court has consistently held that a judgment on the merits is

19

by Delaware's policy against piecemeal litigation, which is designed to conserve judicial resources and avoid prejudicial delay resulting from interlocutory appeals.[92] It is not intended to make it easier for litigants to attack factual findings at the trial-court level.

In any event, the outcome would be the same under Rule 54(b). The rule contains two sentences. The first covers the rule's primary purpose—to permit a party to seek a final judgment on fewer than all claims so that those claims can be directly appealed. Defendants rely on the second. That sentence provides that where the court has entered a partial judgment, but did not deem that judgment final pursuant to Rule 54(b), then the court's "decision is subject to revision at any time

---

not final and appealable until the trial court has ruled on an outstanding application for attorneys' fees." (citation omitted)); *see also CCSB Fin. Corp. v. Totta*, 284 A.3d 713, 2022 WL 4124751, at *1 (Del. Sept. 12, 2022) (TABLE) (same); *In re Rural Metro Corp., S'holders Litig.*, 105 A.3d 990, 2014 WL 7010818, at *1 (Del. Dec. 2, 2014) (TABLE) (same); *Del. Bay Surgical Servs., P.A. v. Swier*, 869 A.2d 327 2005 WL 541016, at *1 (Del. Feb. 15, 2005) (TABLE) (same); *Emerald P'rs v. Berlin,* 811 A.2d 788, 790–91 (Del. 2001) (same); *Lipson v. Lipson*, 799 A.2d 345, 348 (Del. 2001) (same).

[92] *Showell Poultry, Inc. v. Delmarva Poultry Corp.*, 146 A.2d 794, 795 (Del. 1958) ("The purpose of not permitting appeals except in [limited] cases is to prevent piecemeal litigation and to eliminate the delay which might be occasioned by so many interlocutory or interim appeals." (citing *Lewis v. E. I. Du Pont De Nemours & Co.*, 183 F.2d 29, 31 (5th Cir. 1950))); *Tyson Foods, Inc. v. Aetos Corp.*, 809 A.2d 575, 580 (Del. 2002) ("The policy underlying the final judgment rule is one of efficient use of judicial resources through disposition of cases as a whole, rather than piecemeal." (citing *Showell Poultry*, 146 A.2d at 795)); *see, e.g.*, *BlackRock Credit Allocation Income Tr. v. Saba Cap. Master Fund, Ltd.*, 224 A.3d 964, 975–76 (Del. 2020) (describing policy against piecemeal appeals); *Protective Life Ins. Co. v. Navarro*, 238 A.3d 193, 2020 WL 5405865, at *2 (Del. Sept. 4 ,2020) (TABLE) (same); *Hill Int'l, Inc. v. Opportunity P'rs L.P.*, 119 A.3d 30, 36–37 (Del. 2015) (same).

before the entry of the judgment adjudicating all the claims and the rights and liabilities of all the parties."[93]

Rule 54(b) does not, on its face, "identify a standard for determining when it would be warranted to revise an earlier interlocutory order" under the second sentence, but the "law-of-the-case doctrine fills the gap."[94] That is, at a minimum, modifying an order under Rule 54(b) calls for the court to apply the same standard it uses when considering whether to modify a finding or holding that has become law of the case.

The law-of-the-case doctrine "requires that issues already decided by the same court should be adopted without relitigation, and once a matter has been addressed in a procedurally appropriate way . . . , it is generally held to be the law of that case[.]"[95] It is "founded on a public policy against reopening that which has previously

---

[93] Ct. Ch. R. 54(b).

[94] *Perry v. Neupert*, 2019 WL 719000, at *28 n.221 (Del. Ch. Feb. 15, 2019) ("The law-of-the-case doctrine fills the gap."); *see also* 10 James Wm. Moore, *Moore's Federal Practice* § 54.25[4] (2009) ("When the court declines to certify an adjudication under Rule 54(b), it need not reconsider that adjudication unless doing so is consistent with the guidelines of the law of the case doctrine, such as when new evidence is presented that might alter the earlier ruling."); *U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Virginia, LLC*, 899 F.3d 236, 256–57 (4th Cir. 2018) ("[T]he discretion afforded by Rule 54(b) is not limitless, and we have cabined revision pursuant to Rule 54(b) by treating interlocutory rulings as law of the case. This is because, while Rule 54(b) gives a district court discretion to revisit earlier rulings in the same case, such discretion is subject to the caveat that where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." (internal quotation marks omitted) (first quoting *Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017), and then *Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand*, LLP, 322 F.3d 147, 167 (2d Cir. 2003))).

[95] *Taylor v. Jones*, 2006 WL 1510437, at *5 (Del. Ch. May 25, 2006) (citation omitted).

been decided,"[96] and "prevents a defendant from taking two bites of the apple."[97]  In this way, "[t]he doctrine promotes the finality and efficiency of the judicial process."[98] It also operates to "maintain consistency during the course of a single case."[99]

As Defendants observe, the law-of-the-case doctrine is "not inflexible."[100] Delaware courts can revisit a prior adjudication where "there has been an important change in circumstance, in particular, the factual basis for issues previously posed."[101]  Defendants argue that the Stockholder Vote constitutes an "important change in circumstances" based on two decisions of this court—*Weedon* and *Quereguan*.[102]

In *Weedon*, a defendant was convicted based on testimony regarding privileged spousal communications where the court concluded that the defendant waived spousal privilege through disclosure.[103]  The third-party who testified that the

---

[96] 46 Am. Jur. 2d. Judgments § 448 & n.2.

[97] *Id.* at n.2 (citing *Diocese of Quincy v. Episcopal Church*, 56 N.E.3d 573 (App. Ct. 4th Dist. 2016)).

[98] 5 Am. Jur. 2d. Appellate Review § 552.

[99] *Id.*

[100] *Motorola Inc. v. Amkor Tech., Inc.*, 958 A.2d 852, 860 (Del. 2008); *see also People v. Maslowski*, 187 A.D.3d 1211, (2d Dep't 2020) (The law-of-the-case doctrine "is a judicially crafted policy that expresses the practice of courts generally to refuse to reopen what has been decided, and is not a limit to their power; as such, law of the case is necessarily amorphous in that it directs a court's discretion, but does not restrict its authority." (citation omitted)).

[101] *Weedon v. State*, 750 A.2d 521, 527–28 (Del. 2000).

[102] Defs.' Reply Ratification Br. at 30 (first citing *Weedon*, 750 A.2d at 527–28, and then *Quereguan v. New Castle Cnty.*, 2008 WL 1948010, at *1 (Del. Ch. Apr. 22, 2008)).

[103] *Weedon*, 750 A.2d at 523–24.

defendant had disclosed marital communications later recanted, and the defendant sought post-conviction relief.[104]  The State argued that the trial court's factual findings should not be revisited under the law-of-the-case doctrine.[105]  The high court disagreed and ordered an evidentiary hearing on the issue of privilege waiver.[106]

In *Quereguan*, the plaintiffs asserted a claim of nuisance against a school district and county to prevent water draining onto their property.[107]  The court granted the school district's motion to dismiss because the plaintiff failed to adequately allege an essential element of their claim—the existence of an artificial condition causing damage.[108]  Four years later, the county moved for summary judgment, arguing that the same pleading deficiencies warranted judgment in its favor.[109]  In those intervening four years, however, the plaintiff had obtained an engineering report concerning the artificial conditions causing damage.[110]  The court therefore allowed the plaintiff to amend the complaint to conform to the evidence and rejected the county's motion for summary judgment.[111]

Neither *Weedon* nor *Quereguan* support Defendants' argument.  In *Weedon*, the defendants sought new factual findings because the witness's recantation

---

[104] *Id.* at 525.

[105] *Id.* at 527–28.

[106] *Id.* at 529.

[107] *Quereguan*, 2008 WL 1948010, at *1.

[108] *Id.*

[109] *Id.*

[110] *Id.*

[111] *Id.*

23

revealed that the prior findings were false. Defendants expressly disavow any desire for a new factual finding here, stating that they are "not asking for a change of factual findings."[112] Nor does the Stockholder Vote reveal any prior finding to be false. In *Quereguan*, the "law of the case" was a dismissal decision based on pleading deficiencies, which the plaintiff corrected by amending the complaint to conform to the later-developed evidence. Defendants do not use the Stockholder Vote to rebut pleading stage inferences. They present the Stockholder Vote to avoid the consequences of post-trial findings.

At bottom, Defendants seek to introduce a new fact that they created for the purpose of flipping the outcome of the Post-Trial Opinion. Defendants do not cite to a single case where a court has provided such relief under Rule 54(b) or otherwise. And no wonder: Were the court to condone the practice of allowing defeated parties to create new facts for the purpose of revising judgments, lawsuits would become interminable.

Indeed, Defendants' version of "common law ratification" would allow a party found liable for fiduciary misconduct to deploy stockholder ratification to reverse the effects of a court finding *long after* that litigation is final. To their credit, Defendants did not shy away from the logical consequences of their argument. According to them, the ability to seek stockholder ratification after a post-trial decision is a *benefit* of their theory, because a thorough judicial decision provides stockholders with

---

[112] 8/2/24 Hr'g Tr. at 18:10–16.

24

"complete hindsight" and "free choice."[113] They say that "[t]he *ex post* nature of this ratification vote provided Tesla's stockholders with a level of information far surpassing the typical disclosure standards in Delaware. This comprehensive disclosure ensures that stockholders could evaluate the 2018 Agreement based on a full record and actual results, rather than predictions and projections."[114] At oral argument, they admitted that this principle was true not only as to the Post-Trial Opinion, but as to any opinion issued on appeal, where hindsight would be even more complete.[115] In other words, in Defendants' view, a stockholder vote can be deployed to reverse any form of judicial ruling, whatever the ruling, no matter how final. "*Vox populi, vox dei.*"

Defendants' premise is even more troubling when one considers the purpose of derivative litigation. The private enforcement of fiduciary obligations has long been recognized by academics and this court as an essential means of deterring corporate misconduct.[116] Even Defendants' expert witness, who views derivative suits as

---

[113] Defs.' Opening Ratification Br. at 26.

[114] *Id.*

[115] 8/2/24 Hr'g Tr. at 55:12–56:24.

[116] *See* Quinn Curtis & Minor Myers, *Do the Merits Matter? Empirical Evidence on Shareholder Suits from Options Backdating Litigation*, 164 U. Pa. L. Rev. 291, 293 (2016) ("Corporate managers are deterred from wrongdoing by both public and private enforcement. While some types of corporate malfeasance may result in criminal or civil sanctions at the hands of the government, the staff and budget of regulators are limited. For this reason, corporate law relies heavily on private enforcement through state law derivate suits and federal securities class actions."); Kenneth B. Davis, Jr., *The Forgotten Derivative Suit*, 61 Vand. L. Rev. 387, 432 (2008) (Actions addressing misconduct related to executive compensation are "one subcategory of [c]orporate [i]mpropriety cases where the risk of out-of-pocket liability

having limited social value, agrees that they "play[] a useful role in deterring . . . egregious derelictions by corporate managers."[117] Stockholders pursuing derivative claims are already subject to a gantlet of procedural barriers erected to protect Delaware's board-centric model. Among other hurdles, they face: the demand requirement;[118] the contemporaneous ownership requirement;[119] the continuous

---

continues to pose a viable deterrent threat."); James D. Cox, *The Social Meaning of Shareholder Suits*, 65 Brook. L. Rev. 3, 8 (1999) ("Compensation of the injured and deterrence of misconduct commonly are the joint missions of representative suits."); Donald E. Schwartz, *In Praise of Derivative Suits: A Commentary on the Paper of Professors Fischel and Bradley*, 71 Cornell L. Rev. 322, 331 (1986) ("Deterrence is the major reason for and principal effect of derivative suits."); James D. Cox, *Compensation, Deterrence, and the Market As Boundaries for Derivative Suit Procedures*, 52 Geo. Wash. L. Rev. 745, 754 (1984) ("[E]ven the most fervent proponents of market-based solutions believe the derivative suit has a role to play in redressing and deterring managerial misbehavior."); *In re Revlon, Inc. S'holders Litig.*, 990 A.2d 940, 959 (Del. Ch. 2010) ("Perhaps more importantly, entrepreneurial litigators produce a public good by deterring corporate wrongdoing."); *In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 643 (Del. Ch. 2005) (noting importance of representative litigation in protecting stockholders against fiduciary wrongdoing); *In re Fuqua Indus., Inc. S'holder Litig.*, 752 A.2d 126, 133 (Del. Ch. 1999) ("Our legal system has privatized in part the enforcement mechanism for policing fiduciaries by allowing private attorneys to bring suits on behalf of nominal shareholder plaintiffs. In so doing, corporations are safeguarded from fiduciary breaches and shareholders thereby benefit.").

[117] *See* Daniel R. Fischel & Michael Bradley, *The Role of Liability Rules and the Derivative Suit in Corporate Law: A Theoretical and Empirical Analysis*, 71 Cornell L. Rev. 261, 286–87 (1986) (challenging the premise that liability rules enforced by derivative suits play a fundamental role in aligning the interests of managers and investors but acknowledging that "[p]erhaps the derivative suit also plays a useful role in deterring . . . egregious derelictions by corporate managers").

[118] Ct. Ch. R. 23.1(a); *Rales v. Blasband*, 634 A.2d 927, 934–35 n.10 (Del. 1993) (encouraging pre-suit investigations to meet the demand requirement).

[119] 8 *Del. C.* § 327.

ownership requirement;[120] adequacy standards;[121] the threat of being *Walmarted*;[122] and the risk of being derailed by a special litigation committee.[123] Imagine if, after a stockholder successfully clears these hurdles and achieves total victory, a perpetrator of fiduciary misconduct could then hit "reset" through stockholder vote, as Defendants seek to do here?[124] Suffice it to say, such a practice would eviscerate the deterrent effect of derivative suits.

Novelty is not necessarily damning, but Defendants' novel request flies in the face of the policy bases for all relevant rules of procedure and the law-of-the-case doctrine—finality, efficiency, consistency, and the integrity of the judicial process. And on top of that, it could eliminate the deterrent effect of derivative litigation. These sacrifices are not worth the benefits, if any, of Defendants' nouveau ratification theory.

Defendants' procedural inability to introduce newly created evidence under the court rules they invoke is an independent basis for denying the Motion to Revise.

---

[120] *Lewis v. Anderson*, 477 A.2d 1040, 1049 (Del. 1984).

[121] Ct. Ch. R. 23.1(c); *see also, e.g.*, *In re Fox Corp. Deriv. Litig.*, 307 A.3d 979, 987–98 (Del. Ch. 2023) (leadership fight); *In re Delphi Fin. Gp. S'holder Litig.*, 2012 WL 424886, at *1 (Del. Ch. Feb. 7, 2012) (same); *In re Del Monte Foods Co. S'holders Litig.*, 2010 WL 5550677, at *8–11 (Del. Ch. Dec. 31, 2010) (same).

[122] *Cal. State Teachers' Ret. Sys. v. Alvarez*, 179 A.3d 824, 832 (Del. 2018).

[123] *Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981).

[124] Defs.' Opening Ratification Br. at 16 (describing the Ratification Argument as a "reset").

**B.      The Defense Was Not Timely Raised.**

Although stockholder ratification is a substantively complex doctrine, it is procedurally quite simple.  Stockholder ratification is an affirmative defense.  The

Delaware Supreme Court has said so repeatedly.[125]  As an affirmative defense,[126] it

can be waived if not timely raised.[127]

---

[125] *See In re Inv'rs Bancorp, Inc. S'holder Litig.*, 177 A.3d 1208, 1211 (Del. 2017) (noting that when a challenged transaction has been approved by stockholders, "the affirmative defense of stockholder ratification comes into play"); *Rome v. Archer*, 197 A.2d 49, 52 (Del. 1964) (noting the defendants raised "the affirmative defenses of the Statute of Limitations, laches and stockholder ratification"); *Griffith v. Stein on behalf of Goldman Sachs Grp., Inc.*, 283 A.3d 1124, 1136 (Del. 2022) (describing ratification as "a defense . . . invoking a deferential standard of review [] asserted by a defendant"); *see also CompoSecure, L.L.C. v. CardUX, LLC*, 2018 WL 660178, at *22 (Del. Ch. Feb. 1, 2018), *aff'd in part, rev'd in part and remanded on other grounds*, 206 A.3d 807 (Del. 2018) (noting that the defendant "invoked the affirmative defense of ratification, where it bears the burden of proof"); *Dieckman v. Regency GP LP*, 2016 WL 1223348, at *7 (Del. Ch. Mar. 29, 2016), *rev'd on other grounds*, 155 A.3d 358 (Del. 2017) (noting that a valid ratification can cause "an enhanced standard of review that otherwise may apply to a transaction [to] shift to business judgment review"); *Calma v. Templeton*, 114 A.3d 563, 578 (Del. Ch. 2015) ("To avoid the entire fairness standard, Defendants raise the affirmative defense of common law stockholder ratification[.]"); *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 2012 WL 1869416, at *15 (Del. Ch. May 16, 2012), *aff'd sub nom. Scion Breckenridge Managing Member v. ASB Allegiance Real Estate Fund*, 68 A.3d 665 (Del. 2013) (noting that the defendant "raise[d] three affirmative defenses," including that the plaintiff "ratified the agreements"); *Fonds de Regulation et de Controle Cafe Cacao v. Lion Cap. Mgmt., LLC*, 2007 WL 315863, at *3 (Del. Ch. Jan. 22, 2007) (noting that the defendant "raise[d] eight affirmative defenses" including ratification and that "defendant bears the burden of proof with respect to its affirmative defenses"); *In re 3COM Corp. S'holders Litig.*, 1999 WL 1009210, at *3 (Del. Ch. Oct. 25, 1999) ("Plaintiff argues that the business judgment rule does not apply here, since shareholder approval of the Plan amounts to ratification—*an affirmative defense that can only be raised in defendants' answer and on which defendants' bear the burden of proof.*" (emphasis added)); *Brown v. Perrette*, 1999 WL 342340, at *11 (Del. Ch. May 14, 1999) (noting that an allegation of nondisclosure could "attack any affirmative defense raised by defendants that the shareholders ratified the bidding process"); *Moore Bus. Forms, Inc. v. Cordant Hldgs. Corp.*, 1998 WL 71836, at *6 (Del. Ch. Feb. 4, 1998) (noting that the defendants "by way of affirmative defense" argue that "the board's . . . ratification of its previous actions cured any arguable deficiencies in the termination process"); *Loudon v. Archer-Daniels-Midland Co.*, 1996 WL 74730, at *4 (Del. Ch. Feb. 20, 1996), *aff'd,* 700 A.2d 135, 140 (Del. 1997) (noting "where defendant directors rely upon a ratifying stockholder vote as an affirmative defense" that the board "will be required to demonstrate adequate disclosure in the proxy solicitation");

29

*In re Wheelabrator Techs. Inc. S'holders Litig.*, 1992 WL 212595, at \*12 n.5 (Del. Ch. Sept. 1, 1992) (noting that the defendants raise "the affirmative defenses of shareholder ratification and [the company's] exculpatory certificate provision"); *Highlights for Children, Inc. v. Crown*, 227 A.2d 118, 119 (Del. Ch. 1966) (noting that the defendant pled "a number of affirmative defenses, including acquiescence, estoppel and ratification"); *Jaeger v. Muscat*, 221 A.2d 607, 608 (Del. Ch. 1966) (noting that the defendants raised the "affirmative defenses of ratification and estoppel, which if valid . . . serve to disqualify plaintiff as a litigant"); *accord* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery*, Second Edition § 15.05(e)(1) (2022) ("Although traditionally recognized as a powerful affirmative defense to any challenge to the validity or fairness of corporate action, at least when validly secured, stockholder ratification has been accorded widely varied effects, ranging from an outright dismissal of the claim on the one hand to the absence of any litigation-related consequence of any kind on the other.").

[126] Ratification is not among the affirmative defenses listed in Court of Chancery Rule 8(c), but that list, which is based on Federal Civil Rule of Civil Procedure 8(c), is not exhaustive. *See* Wright & Miller, 5 *Fed. Prac. & Proc. Civ*. § 1271 (4th ed.) (stating that the "list of eighteen affirmative defenses in Federal Rule of Civil Procedure 8(c) . . . is not intended to be exhaustive"). Affirmative defenses are "lineal decedent[s] of the common law plea by way of 'confession and avoidance,' which permitted a defendant who was willing to admit that the plaintiff's declaration demonstrated a prima facie case to then go on and allege additional new material that would defeat the plaintiff's otherwise valid cause of action." *Id.* at § 1270; *see also* Victor B. Woolley, *Practice in Civil Actions and Proceedings in the Law Courts of the State of Delaware,* 342 § 477 (1906) ("With respect to the quality of pleas of confession and avoidance, it is of their essence, as the name imports, to confess the truth of the allegation and answer and avoid it by introducing some new matter."). And the affirmative defense of estoppel, which has been a part of the Rule 8(c) list since the Federal Rules of Civil Procedure were adopted in the 1930s, has been recognized by Delaware courts as a close relative of ratification. *See, e.g., Genger v. TR Inv'rs, LLC*, 26 A.3d 180, 195 (Del. 2011) ("Ratification may also be found where a party receives and retains the benefit of that transaction without objection, thereby ratifying the unauthorized act and estopping itself from repudiating it.") (cleaned up) (citation omitted); *Frank v. Wilson & Co.,* 32 A.2d 277, 283 (Del. 1943) (holding that when a "complaining stockholder [is] barred by the estoppel of his acquiescence . . . it is equivalent to saying that by his conduct, the complainant has ratified the matter in dispute" (quoting *Romer v. Porcelain Prods.*, 2 A.2d 75, 76 (Del. Ch. 1938)) (internal quotation marks omitted)); *Italo-Petroleum Corp. of Am. v. Hannigan*, 14 A.2d 401, 406 (Del. 1940) (describing "ratification or acceptance of benefits" as "in the nature of an estoppel" where used "to overcome the defense of want of authority"); *Lewis v. Vogelstein*, 699 A.2d 327, 334–35 (Del. Ch. 1997) ("Assuming that a ratification by an

Whether to permit a party to assert a late-raised defense is a matter of judicial

discretion where the court must take into account the potential for prejudice to the

agent is validly obtained, what is its effect? One way of conceptualizing that effect is that it provides, after the fact, the grant of authority that may have been wanting at the time of the agent's act. Another might be to view the ratification as consent or as an estoppel by the principal to deny a lack of authority.").

[127] *Ratcliffe v. Fletcher*, 690 A.2d 466 (Del. 1996) (TABLE) ("The policy behind Rule 8(c) is to notify the plaintiff if the defendant intends to pursue a defense in the nature of an avoidance. This Court has ruled that failure to raise an affirmative defense may constitute a waiver, if that defense is not raised in a timely fashion." (internal citations omitted)); *id.* at 466 (failure to timely raise affirmative defense "resulted in significant prejudice to [the opposing party] in the form of denying her the opportunity to elect an appropriate course of action thus protect her legal rights"); *ARC Glob. Inv. II, LLC v. Digital World Acq. Corp.*, 2024 WL 4212709, at *16 (Del. Ch. Sept. 16, 2024) ("Affirmative defenses not timely pleaded are waived." (citation omitted)); *InterMune, Inc. v. Harkonen*, 2024 WL 3619692, at *11 (Del. Ch. Aug. 1, 2024) ("In the interests of both fairness and efficiency, parties are expected to assert defenses 'early and loudly.'" (quoting *In re Nantucket Island Assocs. Ltd. P'ship Unitholders Litig.*, 2002 WL 31926614, at *4 (Del. Ch. Dec. 16, 2002))); *Kaufman v. DNARx LLC.*, 2023 WL 9060288, at *4 (Del. Ch. Dec. 29, 2023) (finding affirmative defense of champerty waived where plaintiff "never pled champerty as a defense, never attempted to amend its answering brief, never disclosed a champerty defense in its discovery responses, and failed to identify its purported 'champerty' argument in the pre-trial order"); *Sloan v. Segal*, 2008 WL 81513, at *2 (Del. Ch. Jan. 3, 2008) ("[A]ffirmative defenses . . . are waived if they are not asserted in either a timely Rule 12 motion or, if a timely Rule 12 motion is not filed, in the first responsive pleading."); *Nantucket Island,* 2002 WL 31926614, at *3 ("Rule 8(c) . . . put[s] the onus on defendants to assert these defenses very early on in the case. In that manner, the interests of fairness and efficiency are both well served."); *Barra v. Adams*, 1994 WL 369532, at *6 (Del. Ch. July 1, 1994), *aff'd,* 655 A.2d 306 (Del. 1995) ("As a procedural matter, the estoppel defense comes too late, as it was never pleaded or even referred to in the pretrial order" and instead raised the for the first time at trial.); *see also Principal Life Ins. Co. v. Locker Grp.*, 869 F. Supp. 2d 359, 366 (E.D.N.Y. 2012) (rejecting ratification defense raised at summary judgment phase where defendant failed to plead the affirmative defense in its answer); 2A William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Corporations* § 777, at 626–27 (perm. ed., rev. vol. 2024) ("A failure to plead affirmatively ratification and estoppel may be waived, as by proceeding with the trial without objection. Ratification is essentially an equitable theory of defense; it cannot be used to establish a cause of action.").

opposing party.[128]  This court has allowed a party to raise an affirmative defense based on a stockholder vote that occurred during litigation.[129]  But no court has ever allowed a party to deploy stockholder ratification as a defense after the close of fact finding, with one possible exception.

The possible exception came over seventy years ago in *Kerbs v. California Eastern Airways*.[130]  There, stockholder plaintiffs sought to enjoin the defendant corporation from effectuating stock option and profit-sharing plans.  A majority of the company's stockholders approved the option plan, but the company did not put the profit-sharing plan to a vote.[131]  This court denied the injunction, and the stockholders appealed.  While on appeal, the company put the profit-sharing plan to a stockholder vote.[132]  The Delaware Supreme Court reversed the court's decision on the option

---

[128] *FCG Hldgs. Ltd. v. Teltronics, Inc.*, 2005 WL 2334357, at *8 n.46 (Del. Ch. Sept. 14, 2005) ("Whether a defendant has waived an affirmative defense by failing to assert it timely is a matter left to the discretion of this Court.") (permitting defendant to assert waiver defense "shortly before trial" where plaintiff "failed to present any proof or persuasive argument that it was prejudiced") (citing *Fletcher v. Ratcliffe*, 1996 WL 527207, at *2 (Del. Super. Ct. Aug. 6, 1996), *aff'd*, 690 A.2d 466 (Del. 1996) (TABLE)).

[129] *See, e.g.*, *Michelson v. Duncan*, 407 A.2d 211 (Del. 1979) (affirming summary judgment ruling shifting burden of proof to plaintiff based on ratifying stockholder vote conducted shortly before defendants' summary judgment reply brief was due).

[130] 90 A.2d 652, 659 (Del. 1952) ["*Kerbs I*"]; *see also Kerbs v. California E. Airways*, 83 A.2d 473 (Del. Ch. 1951), *rev'd*, 90 A.2d 652 (Del. 1952) (initial Court of Chancery decision); *Kerbs v. California E. Airways*, 94 A.2d 217 (Del. Ch. 1953) (finding on remand that profit-sharing plan was effectively ratified by post-dismissal, pre-appeal stockholder vote).

[131] *Kerbs I*, 90 A.2d at 656, 658.

[132] *Id.* at 659.

plan, finding the plan deficient despite the stockholder vote.[133]  On the profit-sharing plan, the high court remanded the case back to the trial court to assess the validity of the belated stockholder vote.[134]

*Kerbs* is the lone support for Defendants' assertion that the court can and should consider the Stockholder Vote at this stage.  No other case in the past seventy years comes close.[135]  Its anomalistic quality alone warrants pause.  Its substance is even worse for Defendants.

Relying on *Kerbs*, Defendants hold out common law stockholder ratification as a cure-all that allows the court to reverse a finding of the breach of loyalty.  But that's

---

[133] *Id.* at 657–58.

[134] *Id.* at 660.

[135] Defendants say that courts do not treat stockholder ratification as an affirmative defense, citing a number of cases for the premise that courts "across jurisdictions have recognized the power of ratification to moot stockholder litigation" after litigation has commenced.  Defs.' Opening Ratification Br. at 25–26.  The fact that this court has deemed cases moot due to a stockholder vote is uncontroversial and does not render ratification less of a defense.  Defendants scoured the universe for cases where the court allowed a defense group to seek stockholder ratification late into the case.  In each of the cases cited by Defendants, however, the stockholder vote occurred before judgment.  *See Russell v. Henry C. Patterson Co.*, 81 A. 136 (Pa. 1911) (ratifying vote conducted before the court rendered its decision and considered where all of the company's stock was held by its four directors and the corporate decision was voted on by the board); *Horner v. Marine Eng'rs.' Beneficial Ass'n, No. 97, of San Francisco*, 1 Cal. Rptr. 113 (Ct. App. 1959) (ratifying vote conducted six months after litigation but before the trial court entered judgment and "each payment of salary [at issue] had been reported to and approved at a regular meeting of the membership before payment"); *Smith v. Brown-Borhek Co.*, 200 A.2d 398 (Pa. 1964) (ratifying vote conducted after litigation began but before trial court entered its decision); *Cohen v. Ayers*, 596 F.2d 733 (7th Cir. 1979) (ratifying vote occurred after complaint was filed and formed basis for defendants' motion for summary judgment); *State of Wisconsin Inv. Bd. v. Peerless Sys. Corp.*, 2000 WL 1805376 (Del. Ch. Dec. 4, 2000) (ratifying vote completed "four months and three weeks" before litigation commenced).

not how *Kerbs* used the post-decision vote. There, the initial ruling went in the company's favor, so the court was never asked—as the court is asked here—to consider a stockholder vote conducted with the aim of upending a post-trial decision. And rather than exalting stockholder ratification as a panacea, *Kerbs* clarified the limitations of a stockholder vote. A ratifying vote did not insulate the option plan from judicial review or preclude relief inconsistent with the vote's results—the court enjoined that plan, even though doing so would, as Defendants put it, "disregard the will of [the company's] stockholders."[136] No Delaware decision, including *Kerbs*, has ever allowed a party to raise the defense of stockholder ratification after trial for the purpose of persuading the court to alter (much less flip) its judgment.

Defendants raised the Stockholder Vote defense six years after this action was filed, one and a half years after trial, and five months after the Post-Trial Opinion. Wherever the outer boundary of non-prejudicial delay lies, Defendants crossed it. The court declines to exercise its discretion to permit Defendants to raise the defense of stockholder ratification at this late stage.

### C. The Stockholder Vote Alone Cannot Ratify A Conflicted-Controller Transaction.

The central thesis of Defendants' Ratification Argument is one of agency law—that stockholders are principals of the corporation and directors their agents, and as principals, stockholders can do whatever they want in all contexts. In Defendants' words, "stockholders hold the power to adopt any corporate acts they deem in their

---

[136] Defs.' Opening Ratification Br. at 1.

own best interests."[137]  The flaw with this thesis is that "directors and officers are not agents of the stockholders, nor are the stockholders their principals."[138]  "Rather than treating directors as agents of the stockholders, Delaware law has long treated directors as analogous to trustees for stockholders."[139]  Delaware corporate law applies agency principles only by analogy.[140]

---

[137] *Id*. at 14.

[138] *Palkon v. Maffei*, 311 A.3d 255, 269 n.19 (Del. Ch. 2024); *see also Weinstein Enters., Inc. v. Orloff,* 870 A.2d 499, 509 (Del. 2005) ("To impose a duty of obedience on directors. . .would conflict with the fundamental point that corporate law assigns ultimate managerial power and responsibility to directors.  The parent thus lacks the right to assert control through interim instructions, a defining hallmark of a legal relationship of agency."); *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533, 540 (Del. 1996) ("It would be an analytical anomaly . . . to treat corporate directors as *agents* of the corporation when they are acting as fiduciaries of the stockholders in managing the business and affairs of the corporation."); *In re Sears Hometown and Outlet Stores, Inc. S'holder Litig.*, 309 A.3d 474, 515 n.35 (Del. Ch. 2024); *In re Columbia Pipeline Gp., Inc. Merger Litig.*, 299 A.3d 393, 456 n.24 (Del. Ch. 2023); *Firefighters' Pension Sys. of City of Kansas City, Missouri Tr. v. Presidio, Inc.*, 251 A.3d 212, 286 n.28 (Del. Ch. 2021) (collecting authorities); *Abercrombie v. Davies*, 123 A.2d 893, 898 (Del. Ch. 1956); Dana M. Muir & Cindy A. Schipani, *The Challenge of Company Stock Transactions for Directors' Duties of Loyalty*, 43 Harv. J. on Legis. 437, 444 (2006) ("[T]he fiduciary duties in corporate, including the duty loyalty, have their genesis in the law of trusts."); Justice Joseph T. Walsh, *The Fiduciary Foundation of Corporate Law*, 27 J. Corp. L. 333, 333 (2002) ("The fiduciary concept, as we know, had its origin in the law of trusts[.]"); Ellen Taylor, *New and Unjustified Restrictions on Delaware Directors' Authority*, 21 Del. J. Corp. L. 837, 872 (1996) ("[D]irectors are not agents of either the corporation or its shareholders, because they are not subject to the control of a principal." (footnote omitted)).

[139] *Presidio, Inc.*, 251 A.3d at 286 & nn.27–28 (citations omitted); *see also Hyde Park Venture Fund III, L.P. v. FairXchange, LLC*, 292 A.3d 178, 206 (Del. Ch. 2023) (describing agency principles applied in the corporate context as "metaphorical, not doctrinal").

[140] *Hyde Park,* 292 A.3d at 206 n.9 (citing *In re Invs. Bancorp, Inc. S'holder Litig.*, 177 A.3d 1208, 1223 n.83 (Del. 2017)); *Calma*, 114 A.3d at 579; *Unisuper Ltd. v. News Corp.,* 2005 WL 3529317, at *8 (Del. Ch. Dec. 20, 2005).

Stockholder ratification is one area where corporate law draws by analogy from agency principles. Stockholder ratification borrows from common law ratification, "which contemplates the *ex post* conferring upon or confirming of the legal authority of an agent in circumstances in which the agent had no authority or arguably had no authority."[141]

From this launch point, Delaware courts have developed two forms of stockholder ratification that track Adolph Berle's "twice tested" approach.[142] The first form is a relatively direct application of agency principles. Subject to a few exceptions, Delaware law allows stockholders to bestow legal authority on a corporate act in "circumstances in which the agent had no authority or arguably had no authority."[143] Section 204 of the Delaware General Corporation Law codified this form of stockholder ratification and broadened the doctrine to extend to void acts.[144] This decision refers to the first form of stockholder ratification as "legal ratification" because it cures legal flaws like that analyzed under Professor Berle's first test.

---

[141] *Vogelstein*, 699 A.2d at 334 (citing Restatement (Second) of Agency § 82 (1958)).

[142] A. A. Berle, Jr., *Corporate Powers as Powers in Trust*, 44 Harv. L. Rev. 1049, 1049 (1931) ("[I]n every case, corporate action must be twice tested: first, by the technical rules having to do with the existence and proper exercise of the power; second, by equitable rules somewhat analogous to those which apply in favor of a *cestui que trust* to the trustee's exercise of wide powers granted to him in the instrument making him a fiduciary.").

[143] *Vogelstein*, 699 A.2d at 334 (internal citations omitted); *see also id.* at 335 (referring to this type of ratification as an "after the fact . . . grant of authority that may have been wanting at the time of the agent's act").

[144] 8 *Del. C.* § 204; *see also Wagner v. BRP Gp., Inc.*, 316 A.3d 826, 849 (Del. Ch. 2024).

Defendants do not seek to cure a technical invalidity and do not rely on legal ratification.[145] Demonstrating this fact, they dropped their Section 204 arguments.

The second form of stockholder ratification applies to the second prong of Professor Berle's two-part test. This version allows stockholders to express, through an affirmative vote, their view that a corporate act is "consistent with shareholder interests."[146] This decision refers to the second form of stockholder ratification as a "fiduciary ratification."

The effect of fiduciary ratification varies depending on the corporate decision at issue. In *Lewis v. Vogelstein*, Chancellor Allen identified four "logically available" effects of stockholder ratification on fiduciary actions, noting that a fully informed, uncoerced stockholder vote could: "act[] as a complete defense"; "shift the substantive test on judicial review"; "shift[] the burden of proof"; or have no effect "that deserved judicial recognition."[147] Delaware has not adopted a one-size-fits-all approach to the logically available effects. Instead, Delaware courts have adopted transaction-specific rules that limit the effect of a stockholder vote when conflicts threaten the decision-making process. Just as the standard of review increases as conflicts become more direct and serious,[148] the effect of fiduciary ratification diminishes.

---

[145] 8/2/24 Hr'g Tr. at 252:1–19.

[146] *Vogelstein*, 699 A.2d at 335.

[147] *Id.* at 334.

[148] *See In re Match Gp., Inc. Deriv. Litig.*, 315 A.3d 446, 459–60 (Del. 2022) ("[T]he level of judicial scrutiny increases in certain situations when the danger of conflicts is inherent in the board's decision-making process.").

The Post-Trial Opinion held that the Grant was a conflicted-controller transaction.[149] Conflicted-controller transactions present multiple risks to minority stockholders. There is the "coercion" risk that a controller might retaliate if it does not get its way.[150] There is the "bypass" risk, which envisions that the controller may bypass the board to unilaterally achieve its goals.[151] More relevant to this case, there is the "tunneling" risk that the controller will use its ability to direct corporate actions to extract corporate value through related-party transactions.[152]

Given these risks, Delaware courts apply the most exacting standard of review when reviewing conflicted-controller transactions. As the Delaware Supreme Court recently reaffirmed in *Match*, "entire fairness is the presumptive standard of review" for conflicted-controller transactions.[153] And the maximum effect of stockholder ratification in a conflicted-controller transaction is to shift the burden of proving

---

[149] Post-Trial Op., 310 A.3d at 497–513.

[150] *See Match*, 315 A.3d at 467 (discussing coercion risk); *see also Kahn v. Lynch Comm. Sys., Inc.*, 638 A.2d 1110, 1116–17 (Del. 1994).

[151] *See Match*, 315 A.3d at 467 (discussing bypass risk); *see also* Lawrence A, Hamermesh, Jack B. Jacobs & Leo E. Strine, Jr., *Optimizing the World's Leading Corporate Law: A Twenty-Year Retrospective and Look Ahead*, 77 Bus. Law. 321, 334–35 (2022).

[152] *See In re EZCorp Inc. Consulting Agr. Deriv. Litig.*, 2016 WL 301245, at *2 (Del. Ch. Jan. 25, 2016) (collecting authorities) (discussing tunneling risks); Vladimir Atanasov, Bernard Black & Conrad S. Ciccotello, *Law and Tunneling,* 37 J. Corp. L. 1, 1–39 (2011) (creating a taxonomy of benefits controlling stockholders can extract from corporations); Lucian A. Bebchuk & Kobi Kastiel, *The Perils of Small-Minority Controllers,* 107 Geo. L. J. 1453, 1465–66 (2019) (discussing tunneling risks); Itai Fiegenbaum, *The Geography of MFW-Land* 41 Del. J. Corp. L. 763, 770–73 (2017) (same).

[153] *Match*, 315 A.3d at 451.

38

entire fairness. It cannot, alone, "change the standard of review. If the controlling stockholder wants to secure the benefits of business judgment review, it must follow *MFW*'s requirements."[154]

Defendants did not follow *MFW* here. The "central objective of the *MFW* standard is to provide an incentive for controllers to embrace the procedural approach most favorable to minority investors."[155] Those protections are both an independent, adequately empowered special committee that fulfills its duty of care and an uncoerced, informed vote of a majority of the minority stockholders.[156] The incentive is the protection of the business judgment standard of review."[157] To achieve that objective, the controller must precommit to *MFW* protections. In the parlance of case law, the transaction must be conditioned "*ab initio*" or "before the start of negotiations" on the dual protections.[158] Having *MFW* protections in place "at the start of economic negotiations" is "essential" to "replicate a third-party process"[159] because it prevents a controller from using *MFW* as a bargaining chip. Absent precommitment, the entire fairness standard applies.

Because the precommitment requirement of *MFW* is not a bright-line rule, it inevitably produces "close cases."[160] But this is not a close case. Musk did not

---

[154] *Id.* (citing *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014)).

[155] *Flood v. Synutra Int'l, Inc.*, 195 A.3d 754, 756 (Del. 2018).

[156] *Id.* (citing *MFW*, 88 A.3d at 644).

[157] *Id.*

[158] *Id.* at 755, 763 (clarifying the "*ab initio*" requirement).

[159] *Id.* at 763.

[160] *Id.* at 764.

precommit to *MFW*. He did the opposite. The Board and Musk began negotiating the Grant in 2017, but the Board did not establish the "*MFW*" conditions until 2024. The conditions did not come before the start of economic negotiations.

Tacitly conceding this deficiency in their Ratification Argument, Defendants attempt to recast the relevant timeline for complying with *MFW* to post-trial events. They argue that implementing the *MFW* protections before the Stockholder Vote was sufficient. But it most definitely was not. Defendants acknowledge that they sought stockholder ratification of the very same transaction that the court rescinded—the Grant. One does not "*MFW*" a vote, which is part of the *MFW* protections; one "*MFW*"s a transaction. If one could comply with *MFW* by submitting a rescinded transaction to a second, later vote, then the "up-front precondition" requirement of *MFW* would have little meaning, and *MFW* would fail to fulfill its central objective.

Defendants' failure to adhere to the framework for securing stockholder ratification in a conflicted-controller context offers an independent basis for rejecting the Ratification Argument.[161]

---

[161] In briefing, Defendants further advanced what this decision calls the "disappearing controller" argument—that they need not invoke *MFW* because Musk was not a controller at the time of the Stockholder Vote. This argument starts with the observation that the Post-Trial Opinion found that Musk exercised transaction-specific control over the Grant and did not reach the question of whether Musk exercised general control. Post-Trial Op., 310 A.3d at 510–20. From this, Defendants posit that Musk does not in fact exercise general control (which, again, the Post-Trial Opinion did not hold). Defs.' Opening Ratification Br. at 18. They further state that Musk's transaction-specific control *disappeared* by the time of the Stockholder Vote (an assertion on which there has been no discovery or fact finding). *Id.* at 18–21. To Defendants, therefore, post-trial efforts to reinstate Musk's compensation award were not subject to the entire fairness standard, and *MFW* was unnecessary to restore the business judgment standard. The disappearing-controller argument is

## D. The Proxy Statement Is Materially Misleading.

Because the Grant was a conflicted-controller transaction, if the Stockholder Vote had any ratifying effect, it would be to shift the burden of proof.[162] And for the Stockholder Vote to have even that limited effect, the vote must have been fully informed and uncoerced.[163] Plaintiff argues that the Stockholder Vote was uninformed and coerced. Because Plaintiff has demonstrated that the vote was not fully informed, this decision does not reach the parties' arguments regarding coercion.

There are many ways in which the Proxy Statement mangles the truth,[164] but one failure is most problematic for the purposes of the Ratification Argument. To be fully informed for ratification purposes, "the stockholders must be told specifically . . . what the binding effect of a favorable vote will be."[165] The Proxy Statement makes multiple, inaccurate statements concerning the potential ratifying effect of the Stockholder Vote.

In the Proxy Statement, Tesla told its stockholders that:

---

problematic for many reasons, but here is the most obvious one: It ignores that the Stockholder Vote concerned the Grant, which was negotiated in 2017 and 2018 through a process that Musk controlled. Post-Trial Op., 310 A.3d at 103–46. To their credit, Defendants abandoned the disappearing-controller argument by the time of the August 2 hearing. 8/2/24 Hr'g Tr. at 32:10–23. Accordingly, this decision need not list all the problems with the argument.

[162] *Match*, 315 A.3d at 451.

[163] *Lynch*, 638 A.2d at 1117 (noting that approval by an informed majority of minority shareholders shifts the burden of proof); *Investors Bancorp,* 177 A.3d at 1211 ("[S]tockholder ratification means a majority of fully informed, uncoerced, and disinterested stockholders approved board action[.]").

[164] *See supra* n.75 (discussing the Denholm Letter).

[165] *Garfield v. Allen*, 277 A.3d 296, 353 (Del. Ch. 2022).

41

- Their vote could "extinguish claims for breach of fiduciary duty by authorizing an act that otherwise would constitute a breach."[166]

- "[T]he deficiencies, including disclosure deficiencies, procedural deficiencies, and breaches of fiduciary duty, identified by the Delaware Court in connection with the Board and our stockholders' original approval of the 2018 CEO Performance Award should be ratified and remedied and any wrongs found by the Delaware Court in connection with the 2018 CEO Performance award should be cured."[167]

- "[I]f the 2018 CEO Performance Award is ratified, those options will be restored to Mr. Musk. As a result, Mr. Tornetta may not be considered to have rendered the 'benefit' to Tesla through his lawsuit that is claimed by his attorneys."[168]

- And "a new stockholder vote allows the disclosure deficiencies found by the *Tornetta* court to be corrected, among other things."[169]

All of this is materially false or misleading. As discussed above, under Delaware law, ratification cannot be deployed post-trial to extinguish an adjudicated breach of the duty of loyalty. It cannot cleanse a conflicted-controller transaction absent the full suite of *MFW* protections. At best, and when properly raised as an affirmative defense in these circumstances, ratification shifts the burden of proof.[170]

---

[166] Proxy Statement at 84.

[167] *Id.* at 85.

[168] *Id.*; *see also id.* at 88 ("The plaintiff's theory is that his lawsuit 'benefitted' Tesla by causing the cancellation of options issued to Mr. Musk under the 2018 CEO Award. If the 2018 CEO Performance Award is ratified, these options will be restored to Mr. Musk. As a result, Mr. Tornetta may not be considered to have rendered the benefit to Tesla through his lawsuit[.]").

[169] *Id.* at 86.

[170] Defendants also rely on *In re Dell Technologies Inc. Class V Stockholders Litigation*, 2020 WL 3096748 (Del. Ch. June 11, 2020), to support the premise that the Stockholder Vote had a "cleansing" effect. Defs.' Opening Ratification Br. at 23–24, 32, 39. There, the court granted a motion to dismiss where the plaintiffs had pled facts supporting a reasonable inference that the defendants failed to comply with

During oral argument, defense counsel pointed the court to Telsa's efforts in the Proxy Statement to hedge some of its more bullish disclosures. Under the heading "Certain Additional Considerations and Risks Associated with the Ratification," for example, the Proxy Statement disclaims that a court "may find that the Ratification is not fair to stockholders . . . or that the Ratification is otherwise legally defective."[171] But the lack of basis for Defendants' legal position is not a mere "Additional Consideration" or "Risk." Nor does the vague phrase "otherwise legally defective" fully capture the issues. This caveat does not correct the total mix of information nor temper Tesla's presentation of ratification as a comprehensive cure-all.

The Proxy Statement's multiple, material misstatements concerning the effect of the Stockholder Vote, ironically, independently bar that vote from having any ratifying effect.[172]

---

*MFW*. *Dell*, which considered a pre-transaction vote, bears no resemblance to this case.

[171] *See* Proxy Statement at 86 ("Certain Additional Considerations and Risks Associated with the Ratification").

[172] During the August 2 hearing, the court raised the following issue: What standard should the court apply when evaluating whether the Stockholder Vote was fully informed? Because the court has made no factual findings concerning the Stockholder Vote, one logical choice is to adopt a pleading-stage standard. Defense counsel conceded as much. 8/2/24 Hr'g Tr. at 108:20, 110:17–23. A pleading-stage standard requires plaintiff-friendly inferences. *Central Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs.*, 27 A.3d 531, 535 (Del. 2011). Defense counsel conceded that too. 8/2/24 Hr'g Tr. at 111:1–5. One conclusion to draw from these points is that, once concluding that it is reasonably conceivable that the Proxy Statement was materially deficient, the parties should move forward with fact finding on the sufficiency of the vote. *See* 8/2/24 Hr'g Tr. at 112:22–113:1. Of course, this case is not at the pleading stage. It is at the opposite of the pleading stage. Reopening the record to probe the sufficiency of the Stockholder Vote would be inappropriate and highly prejudicial for

### E. Conclusion On The Ratification Argument

Each of the four problems with the Ratification Argument are enough to defeat the Motion to Revise. Taken together, they pack a powerful punch. The Motion to Revise is denied.

## III. LEGAL ANALYSIS OF THE FEE PETITION

Plaintiff requests a fee equal to 11% of the vested Grant options, or 29,402,900 shares. Based on Tesla's stock price as of the date of the Post-Trial Opinion, those shares are worth approximately $5.6 billion.[173] Defendants argue that Plaintiff's counsel should be paid in cash and receive no more than $54.5 million—which is 4x their lodestar, and about 1% of Plaintiff's request.[174] That leaves the parties over $5.5 billion apart. That's no small gap to bridge.

The default rule in American litigation is that litigants pay their own legal fees.[175] An exception to this rule allows the court to award fees to counsel who created a "common benefit" for a class or, in a derivative action, the corporation. One type of

---

the reasons already discussed. The court declines to reopen the record to allow fact finding into whether the Stockholder Vote was fully informed or coerced.

[173] Pl.'s Opening Fee Br. at 48 n.127.

[174] The lodestar is the hours Plaintiff's counsel spent on this litigation multiplied by their hourly rate.

[175] *Maurer v. Int'l Re-Insurance Corp.*, 95 A.2d 827, 830 (Del. 1953) ("We start with the general principle that, apart from statute or contract, a litigant must pay his counsel fees. 'The general and well recognized rule subject to but a few exceptions, is that a litigant must himself defray the costs of representation by counsel.'" (quoting *In re Equitable Tr. Co.*, 30 A.2d 271, 272 (Del. Ch. 1943))); *Tandycrafts, Inc. v. Initio P'rs*, 562 A.2d 1162, 1164 (Del. 1989) (describing the American rule).

common benefit involved the creation of a common fund.[176]  In a common fund case, counsel's fees are paid from the fund.[177]  This creates a conflict between counsel and their clients—"[t]he more the attorneys receive, the less goes to the [client]."[178]  The same conflict arises indirectly when the corporation receives a benefit.  The benefit typically goes to the corporation, less an amount paid in fees to counsel.

As fiduciaries for their clients and under rules of professional responsibility, counsel must limit their fee request to what is reasonable.[179]  But the court still has an important role to play in policing conflicts that arise in this context.  When awarding fees for a common benefit, the court "must make an independent determination of reasonableness on behalf of the common fund's beneficiaries[.]"[180] "[This] task is not cursory."[181]

Delaware courts apply the *Sugarland* factors to assess the reasonableness of a fee award.  Those factors are:

> (1) the result achieved; (2) the time and effort of counsel; (3) the relative complexities of the litigation; (4) any

---

[176] *Goodrich v. E.F. Hutton Gp., Inc.*, 681 A.2d 1039, 1044 (Del. 1996) (discussing the history of the common-fund doctrine); *Chrysler Corp. v. Dann*, 223 A.2d 384, 256 (Del. Ch. 1966), *aff'd* 233 A.2d 384 (Del. 1966) (applying the common-fund doctrine in the derivative context, explaining that that the exception allows fee awards "provided the litigation . . . has specifically and substantially benefitted the class which, in a derivative action, is the corporation" (collecting cases)).

[177] *Dell Appeal*, 2024 WL 3811075, at *7.

[178] *Id.*; *see generally Goodrich*, 681 A.2d at 1045.

[179] *Dell Appeal*, 2024 WL 3811075, at *7.

[180] *Goodrich*, 681 A.2d at 1045.

[181] *Dell Appeal*, 2024 WL 3811075, at *7.

contingent factor; and (5) the standing and ability of counsel involved.[182]

Of these factors, "the first factor – the results achieved – is paramount."[183] The other factors are secondary. As part of the first factor, the court must also consider the causal relationship between "what counsel accomplished through the litigation and the ultimate result."[184]

The Delaware Supreme Court has eschewed any "formulaic" or "mechanical approach" under *Sugarland*, emphasizing that this court enjoys broad discretion when awarding fees.[185] The overarching goal is to right-size fee awards to the benefit achieved. By doing so, the court provides incentives for "counsel to accept challenging cases" despite "the risk of recovering nothing in the end," while simultaneously avoiding awards that "exceed their value as an incentive to take representative cases and turn into a windfall."[186]

---

[182] *Id.* at *8.

[183] *Id.*; *see also Olson v. EV3, Inc.*, 2011 WL 704409, at *8 (Del. Ch. Feb. 21, 2011) ("In determining the size of an award of attorneys' fees, courts assign the greatest weight to the benefit achieved in light of the nature of the claims and the likelihood of success on the merits." (internal quotation marks omitted)).

[184] *Dell Appeal*, 2024 WL 3811075, at *8; *see also Dell. Chancery*, 300 A.3d at 692 ("The causal dimension is critical, because Delaware public policy calls for compensating counsel for the beneficial results they produced. Counsel cannot take credit for results they did not produce, so a court must consider whether the plaintiff can rightly receive all the credit for the benefit conferred or only a portion thereof." (cleaned up)).

[185] *Dell Appeal*, 2024 WL 3811075, at *8 (eschewing a "formulaic approach to fee requests" and affirming "the discretion of the Court of Chancery" to award fees); *see also Kaung v. Cole Nat'l Corp.*, 884 A.2d 500, 506 (Del. 2005) (describing the trial court's discretion in fixing the amount of attorneys' fees as "broad" under *Sugarland*).

[186] *Dell Appeal*, 2024 WL 3811075, at *12.

46

Although this court enjoys broad discretion when setting fees, case law offers lessons. For example, the Delaware Supreme Court has expressly rejected the lodestar approach, which "takes the time expended by counsel and multiplies it by an approved hourly rate."[187] The lodestar approach is an easy test that fosters predictable outcomes, but it creates bad billing incentives. By looking exclusively at the time invested and attorneys' billing rates, the lodestar approach "encourages attorneys presenting fee petitions to engage in duplicative and unjustified work, inflate their 'normal' billing rate, and include fictitious hours or hours already billed on other matters."[188]

By contrast, the stage-of-case approach established in *Americas Mining* and endorsed in *Dell* appropriately focuses on results and not hours. The stage-of-case approach starts by calculating a fee as a percentage of the benefit achieved, basing that percentage on the stage of the case at which the litigation is resolved.[189] When a case resolves early, the guideline range is 10–15%.[190] When a case resolves after meaningful litigation efforts, including multiple depositions and some level of motion practice, the guideline range is 15–25%.[191] The highest percentage of 33% is reserved

---

[187] *Id.* at *8.

[188] *In re Sauer-Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1138 (Del. Ch. 2011) (citation omitted).

[189] *Dell Chancery*, 300 A.3d at 686 (discussing *Americas Mining Corp. v. Theriault*, 51 A.3d 1213, 1259–60 (Del. 2012)).

[190] *Id.* at 694.

[191] *Id.*

for plaintiffs who prevail after trial.[192]  "Other *Sugarland* factors may cause the court

to adjust the indicative fee up or down, but the starting point under *Americas Mining*

is a percentage calculation."[193]

The stage-of-case method offers many benefits.  Importantly, it aligns the

incentives of plaintiffs' counsel with those of the class or nominal defendant by

awarding increasing percentages "as counsel pushes deeper into a case."[194]  It is also

a relatively straightforward test, which allows for "consistent awards so that similar

cases are treated similarly."[195]  Precedents and predictability help "shape future

behavior" by informing plaintiffs' firms, who can see that significant results generate

meaningful fees.[196]  That predictably in turn strengthens the ability of representative

litigation to serve as a deterrent to fiduciary misconduct.

There is, however, a downside to the stage-of-case method, which is on full

display here—the potential for windfalls in "megafund" cases.[197]  As the Delaware

Supreme Court recently cautioned:

---

[192] *Id.*

[193] *Id.* at 692.

[194] *Id.* at 693; *see generally id.* (discussing the "conflict" between class counsel and the class and how the stage-of-case method serves as a "corrective measure").

[195] *Id.* at 695.

[196] *Id.*

[197] Although there is no fixed definition for a "megafund" case, the term frequently refers to class actions that involve common funds exceeding $100 million.  *See generally* Joseph M. McLaughlin, 2 *McLaughlin on Class Actions: Law and Practice*, § 6.24 (21st ed.) (discussing megafund cases); *see also Stop & Shop Supermarket Co., v. SmithKline Beecham Corp.*, 2005 WL 1213926, at *9 (E.D. Pa. May 19, 2005) (describing "megafund" cases as cases involving common funds of $100 million or

Given the equitable principles underpinning fee awards in common fund cases, and this Court's concern for excessive compensation or windfalls, it is entirely appropriate and indeed essential for the court to consider the size of the award in a megafund case when deciding the fees percentage. An award can be so large that typical yardsticks, like stage of the case percentages, must yield to the greater policy concern of preventing windfalls to counsel.

Windfalls are a particular concern in megafund cases. As lawyers and judges, we understand that representative litigation performs a valuable service to stockholders who individually might not have the resources or the will to pursue fiduciaries for breach of their duties. The potential for large fees incentivizes counsel to accept challenging cases. They assume the risk of recovering nothing in the end. In Delaware, we are used to big numbers.

But it is also legitimate to ask, outside our somewhat insular legal universe, whether the public would ever believe that lawyers must be awarded many hundreds of millions of dollars in any given case to motivate them to pursue representative litigation or to discourage counsel from settling cases for less than they are worth. At some point, the percentage of fees awarded in a megafund case exceed their value as an incentive to take representative cases and turn into a windfall.[198]

With these cautionary words top of mind, the court turns to the analysis.

## A.    The Primary *Sugarland* Factor

The primary *Sugarland* factor looks to the value of the benefit created by counsel's efforts. The Post-Trial Opinion ordered rescission of 303,960,630 fully

---

more); *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F.Supp.2d 1028, 1032 (N.D. Ill. 2011) (same); *Holman v. Student Loan Xpress, Inc.*, 778 F.Supp.2d 1306, 1320 n.8 (M.D. Fla. 2011) (same).

[198] *Dell Appeal*, 2024 WL 3811075, at *11–12.

vested options with a strike price of $23.33.[199]  The parties dispute how to value that benefit.

Plaintiff values the benefit at $51 billion based on the intrinsic value of the shares and, independently, the value of reversing the dilutive effect of the options.[200] Plaintiff does not seek 33% of that amount, although a strict application the *Americas Mining* guideline ranges would support that request.[201]  Instead, Plaintiff uses the 15% award of *Americas Mining* as the starting point and applies a "liquidity" discount based on the Grant's five-year holding period to get to around 11.0145%.[202]  To support that position, Plaintiff introduced expert testimony from former SEC Commissioner and current New York University School of Law Professor Robert J. Jackson, Jr., as well as a declaration that he co-authored with Harvard Law School Professor Lucian A. Bebchuk.[203]  Plaintiff also introduced the affidavit of The Wharton School Professor Daniel Taylor.

Defendants raise issues with each of Plaintiff's arguments, but they do not dispute that the Post-Trial Opinion created some benefit for which Plaintiff's counsel should be paid.  They minimize the benefit of governance improvements and

---

[199] Post-Trial Op., 310 A.3d at 547–48.

[200] Pl.'s Reply Fee Br. at 4–8.

[201] *Americas Mining,* 51 A.3d at 1259.

[202] Plaintiff's expert, Professor Taylor, calculated a liquidity discount of 26.57% using a Finnerty Model and Tesla's most recently disclosed volatility of 63%.  Taylor Aff. ¶ 13 n.3.

[203] *See also*, Yale Aff. ¶¶ 5–18 (discussing the tax implications of the Grant).

disclosures resulting from the Post-Trial Opinion.[204]   These are the only benefits, according to Defendants, because the Stockholder Vote mooted the effect of rescission by reinstituting Musk's pay package.  Because Plaintiff did not attempt to value the governance and disclosure benefits that Defendants identify, and due to the difficulties valuing rescission generally, Defendants argue that Plaintiff should be granted fees based on *quantum meruit*.  As a fallback, they propose valuing the benefit based on the GDFV.  To support their position, Defendants introduced the expert testimony of Chicago Law School Professor Daniel R. Fischel and the declaration of Stanford University Business School Professor Steven Grenadier.[205]

### 1.    Plaintiff's Position

Plaintiff advances two methods to justify a $51 billion valuation.  Plaintiff's first method posits that the shares that would have been delivered to Musk can now be used for other purposes.  Plaintiff argues that the value of the benefit is equal to the intrinsic value of the number of shares previously reserved and "freed up" by the rescinded Grant.[206]  This decision refers to Plaintiff's first argument as the "intrinsic-value theory."

Plaintiff's second approach focuses on the dilutive effect of the Grant to Tesla stockholders.  Plaintiff argues that the market had priced the dilutive effect of the Grant into the trading price of Tesla's shares and that rescission reversed that effect.

---

[204] 8/2/24 Hr'g Tr. at 127:15–21, 129:2–9.

[205] *See also*, Skinner Decl. ¶¶ 11(a)–(h) (rebutting Plaintiff's use of employee stock options to value the benefit of recission).

[206] Pl.'s Opening Fee Br. at 23.

The value of rescission thus equals the value of the Grant's dilution. This decision refers to Plaintiff's second argument as the "reverse-dilution theory."

### a. The Intrinsic-Value Theory

The intrinsic-value theory starts from the premise that corporations use shares as currency. As Professors Bebchuk and Jackson explained, corporations exchange shares for services, property, or cash, through various channels, including public offerings, private offerings, or on the market.[207] Corporations pay to acquire other companies with their shares.[208] They secure the labor of executives and employees by shares or options (backed by shares).[209] Counterparties accept shares as consideration because holding shares entitles the holders to a proportional slice of the company's future cash flows.[210] And unissued shares give corporations the flexibility to raise capital and engage in other corporate transactions in the future. Delaware's position that dilutive share issuances impose derivative harm on the corporation rests on this premise.[211] Thus, unissued shares have value to the corporation.

---

[207] Bebchuk & Jackson Decl. ¶ 34 (citing Richard Brealey et al., *Principles of Corp. Fin.* §§ 15-2, 396–405 (13th ed. 2020) and Malcolm Baker & James Quinn, *Auctioning Morningstar*, Harv. Bus. Sch. Case No. 9-206-203 (2006) (providing a case study of alternative methods of selling equity to the public)).

[208] *Id.* (citing B. Espen Eckbo et al., *Strategic Decisions in Takeover Auctions: Recent Developments*, 12 Ann. Rev. Fin. Econ. 237 (2020) (surveying theories on the use of stock-based consideration in mergers)).

[209] *Id.* (citing Carola Frydman & Dirk Jenter, *CEO Compensation*, Ann. Rev. Fin. Econ. 75 (2010)).

[210] *Id.* at ¶ 35 (citing Brealey et al., *Principles of Corp. Fin.* §§ 15-2, 296–405 (13th ed. 2020)).

[211] *Brookfield,* 261 A.3d 1251.

52

When the Board approved the Grant, the Board adopted a resolution reserving shares sufficient to fund the Grant if Musk became entitled to and then exercised the options.[212] Rescission had the effect of freeing the previously reserved shares thereby increasing the number of authorized, unissued shares available for Tesla's use.

Plaintiff says that the value of rescission equals the intrinsic value of the freed-up shares, which is the trading price, minus the exercise price, multiplied by the number of options.[213] For purposes of determining the intrinsic value of the shares subject to rescission, Plaintiff used the trading price as of the date of the Post-Trial Opinion. Based on the $191.59 per share closing price and the $23.33 exercise price, the Grant's 303,960,630 options could have been exercised on a cashless basis for a total of 266,947,208 shares.[214] That results in an intrinsic value of approximately $51 billion.

Defendants argue that the intrinsic-value approach rests on bad economic theory. As Professor Fischel explained, a "fundamental tenet" of corporate finance is that "the value of the firm derives from the risk-adjusted present value of the cash

---

[212] JX-791 at 6 (01/21/2018 Tesla Board Minutes stating "[t]hat subject to the Requisite Stockholder Approval, the Board (with Messrs. Elon and Kimbal Musk recusing themselves) hereby authorizes and reserves sufficient shares of the Company's common stock for the issuance of such shares pursuant to any vesting and exercise of any portion of the Performance Award").

[213] Bebchuk & Jackson Decl. ¶ 54.

[214] *Id.* ("[T]he Intrinsic Value is equal to the value of the 266,947,208 shares that the CEO would obtain in a scenario of a cashless exercise."); *see also* Taylor Aff. ¶13. The actual number is 266,947,208.12 shares, but the court rounded down to the nearest whole share for simplicity. Musk could have also obtained 303,960,630 Tesla shares but would have had to pay the strike price of $23.33 per share. Bebchuk & Jackson Decl. ¶ 53.

flows that the firm's assets are expected to generate."[215]  When "a firm issues equity

to the market or in exchange for the purchase of assets, the firm receives value in

exchange for the issuance."[216]  Equity-based compensation, however, does not affect

the value of the firm ("setting aside the impact of the expected efforts of the

employee").[217]  That is because "there is no cash outlay" and no "change in either the

firm's expected cash flow or the riskiness of those cash flows."[218]

Equity-based compensation is, effectively, a "reallocation of the value of the

firm among stockholders through the resulting dilution[.]"[219]  That is, "each

stockholder has a reduced percentage claim on the unchanged firm value, and the

stockholders effectively pay the compensation directly because each stockholder

bears a proportionate reduction in the percentage of the unchanged firm value on

which they have a claim[.]"[220]  The hope is that the overall value of the firm increases

over the course of the grant period by enough to offset the reduction in each

stockholder's proportionate percentage of the firm.[221]

---

[215] Fischel Decl. ¶ 17.

[216] *Id.* at ¶ 18.

[217] *Id.* at ¶ 19.

[218] *Id.*

[219] *Id.*

[220] *Id.*

[221] Fischel Decl. ¶ 19.  Attorneys Christine J. Chen and Carson Zhou helpfully expressed this concept in layperson's terms, explaining that "[s]tock holds value only insofar as it is a proxy for a portion of the entity, and stock that the company itself holds or has otherwise not yet issued has no economic value."  Christine J. Chen and Y. Carson Zhou, Tooley Brooks *No Exceptions—Equity Dilution Is Direct*, 26 U. Pa. J. Bus. L. 1, 4 (Dec. 2023) ["*No Exceptions*"]; *id.* at 30 n.107 (first citing J.C. Ray,

That assertion does not mean that the shares have no value. It means that the shares assume reallocated value at the expense of the stockholders, which is the premise of the reverse-dilution theory. In other words, Defendants' criticisms concerning the intrinsic-value theory support the reverse-dilution theory, which reaches the same value.

### b. The Reverse-Dilution Theory

Plaintiff argues that the market had already priced into Tesla's trading price the dilutive effect of the Grant,[222] which Defendants peg at 8.2%.[223] Rescinding the options therefore reversed the dilutive effect of the Grant, restoring around $51 billion in value to Tesla stockholders.[224] This argument is consistent with Defendants' criticism of the intrinsic-value theory. According to Defendants, excessive equity-based compensation does not affect the value of the firm. Rather, it reallocates value among the stockholders. That is, if anyone is harmed, it is the stockholders. The converse is that rescinding equity-based compensation benefits stockholders. Thus, one value of rescission is to Tesla stockholders, who benefit from reversing the dilutive effect of the Grant.

---

Accounting for Treasury Stock, 37 Acct. Rev. 753, 753 (1962); and then L. L. Briggs, *Treasury Stock and the Courts*, 56 J. Acct. 171, 173, 197 (1933)). And "[e]quity issuances . . . do not transfer value from the entity. Instead, they redistribute existing stockholders' economic and voting rights in the entity to new or other stockholders." *No Exceptions*, at 30.

[222] *See* Bebchuk & Jackson Decl. ¶¶ 46–54; 7/8/24 Hr'g Tr. at 21:3–13 (Jackson).

[223] Grenadier Decl. ¶ 42; *see also* Grenadier Dep. Tr. at 20:16–21:8, 88:16–89:4, 122:16–123:1, 178:15–19; Fischel Decl. ¶ 24; Fischel Dep. Tr. at 249:18–250:3.

[224] Bebchuk & Jackson Decl. ¶ 52 n.50.

Defendants advance three criticisms of the reverse-dilution theory. First, they contend that the court cannot consider benefits to stockholders when valuing benefits achieved through derivative litigation (the "form-over-substance criticism"). Second, they argue based on an event study that there was no reverse dilution (the "event-study criticism"). Third, they say that the reverse-dilution theory inappropriately values the benefit of rescission based on the current, ex-post value of Tesla's stock (the "*ex-post* criticism").

### i. The Form-Over-Substance Criticism

Defendants' first argument rests on Delaware cases that deem claims challenging equity-based compensation exclusively derivative.[225] Because Plaintiff sued derivatively on behalf of Tesla, Defendants argue that the court should focus solely on valuing the benefits of rescission *to Tesla* when awarding fees.[226] This argument is consistent with rhetoric in common-benefit cases awarding fees based on the benefit to the corporation.[227] But it is otherwise misguided. Explaining why this criticism misses the mark calls for a brief digression on the historically elusive nature of derivative claims.

In 2004, the Delaware Supreme Court fashioned the current test for distinguishing derivative claims in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*[228]

---

[225] Defs.' Ans. Fee Br. at 20–21.

[226] *Id.* at 20–37.

[227] *Dell Appeal*, 2024 WL 3811075, at *7.

[228] 845 A.2d 1031 (Del. 2004) ["*Tooley II*"], *aff'g in part, rev'g in part* 2003 WL 203060, (Del. Ch. Jan. 21, 2003) ["*Tooley I*"].

*Tooley* involved a third-party, two-step acquisition in which the target corporation consented to the acquirer postponing the closing of the first-step tender offer by twenty-two days.[229] Stockholders of the target corporation sued, claiming that they were entitled to have the deal close on time. They sought damages in the amount of the time-value of money that they had lost from the delay.[230]

The Court of Chancery held that the claims were derivative and dismissed them under Rule 23.1.[231] In reaching this conclusion, the trial court relied on Delaware decisions employing the concept of "special injury" to determine when a plaintiff could sue directly.[232] Those decisions defined special injury as a wrong "separate and distinct from that suffered by other shareholders . . . or a wrong involving a contractual right of a shareholder."[233] Under the special-injury test, the court held that there was no meaningful distinction between the contract rights of the tendering and non-tendering stockholders, such that they all held parallel contract rights.[234] The decision then reasoned that "[b]ecause this delay affected all . . . shareholders equally, plaintiffs' injury was not a special injury, and this action is, thus, a derivative action at most."[235] In other words, the trial court accepted the

---

[229] *Id.* at 1034.

[230] *Id.*

[231] *Tooley I*, 2003 WL 203060, at *2.

[232] *Id.* at *2–3; *see Lipton v. News Int'l, Plc*, 514 A.2d 1075, 1079 (Del. 1986).

[233] *Moran v. Household Int'l, Inc.*, 490 A.2d 1059, 1070 (Del. Ch. 1985), *aff'd*, 500 A.2d 1346 (Del. 1985) ["*Moran I*"] (internal citations omitted).

[234] *Tooley I*, 2003 WL 203060, at *4.

[235] *Id.*

argument that it was appropriate to treat a claim—there, a contractual claim—as derivative if all of the stockholders held the same right and all suffered the same injury to their parallel right.

The Delaware Supreme Court reversed. The high court recognized that the concept of special injury had become "amorphous."[236] The court traced much of the uncertainty to *Bokat v. Getty Oil Co.*, where it held that "[w]hen an injury to corporate stock falls equally upon all stockholders, then an individual stockholder may not recover for the injury to his stock alone, but must seek recovery derivatively in [sic] behalf of the corporation."[237] The *Tooley* court described *Bokat* as "confusing and inaccurate" for the following reasons:

> It is confusing because it appears to have been intended to address the fact that an injury to the corporation tends to diminish each share of stock equally because corporate assets or their value are diminished. In that sense, the *indirect* injury to the stockholders arising out of the harm to the corporation comes about solely by virtue of their stockholdings. It does not arise out of any independent or direct harm to the stockholders, individually. That concept is also inaccurate because a direct, individual claim of stockholders that does not depend on harm to the corporation can also fall on all stockholders equally, without the claim thereby becoming a derivative claim.[238]

In this passage, *Tooley* reframed the analysis in a way intended to remedy the confusion caused by *Bokat* by distinguishing between (i) an injury that fell *indirectly* on all stockholders equally, which gave rise to a derivative claim, and (ii) an injury

---

[236] *Tooley II*, 845 A.2d at 1035.

[237] 262 A.2d 246, 249 (Del. 1970), *abrogated by Tooley II*, 845 A.2d at 1038–39.

[238] *Tooley II*, 845 A.2d at 1037.

that affected stockholders *directly*, even if all stockholders suffered the same injury, which gave rise to a direct claim.[239] *Tooley* then rejected the special-injury test in favor of a new, two-part standard, asking: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[240]

Although *Tooley* was intended to simplify the test for derivative claims, questions lingered in its wake. Two years after *Tooley*, the Delaware Supreme Court identified in *Gentile v. Rossette* a type of claim that was both direct and derivative or "dual natured."[241] In *Gentile*, the corporation's controller caused the company to "forgive a portion of the company's $3 million debt to him in exchange for additional equity,"[242] which had the effect of increasing the controller's position from 61% to 93.5%, while the minority's stake fell from 38% to 6%.[243] The controller, affiliated with the CEO, then negotiated a favorable put agreement for himself in connection with a merger.[244] The transaction reallocated both economic value and voting power from the minority to a controlling stockholder, and the plaintiff-stockholder

---

[239] *See generally In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 132 A.3d 67, 97–99 (Del. Ch. 2015) (describing *Tooley*'s treatment of the analysis in *Bokat*), *rev'd on other grounds sub nom., El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248 (Del. 2016).

[240] *Tooley II*, 845 A.2d at 1033.

[241] 906 A.2d 91 (Del. 2006).

[242] *Id.* at 93.

[243] *Id.* at 95.

[244] *Id.*

challenged the transaction both directly and derivatively.[245] The trial court granted summary judgment in favor of the defendants on the grounds that the claim was exclusively derivative, and the plaintiff had not met the Rule 23.1 standard.[246]

On appeal, the high court described the plaintiff's claims as a "species of corporate overpayment claim" and stated that, typically, claims of corporate overpayment are exclusively derivative because both the harm (the overpayment) and the remedy (the damages) flow to the corporation.[247] The court further observed that "[t]here is . . . at least one transactional paradigm—a species of overpayment claim— that Delaware case law recognizes as being both derivative and direct in character."[248]

The Delaware Supreme Court held that this dual-natured claim arises when:

> (1) a stockholder having a majority or effective control causes the corporation to issue 'excessive' shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling shareholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders.[249]

In this situation, the claim retains the features that make it derivative in nature. But "the public (or minority) stockholder also has a separate, and direct, claim arising

---

[245] *Id.*

[246] *Id.* at 97.

[247] *Id.* at 99.

[248] *Gentile*, 906 A.2d at 99.

[249] *Id.* at 100.

out of the same transaction"[250] due to the "extraction from the public shareholders, and a *redistribution* to the controlling shareholder, of a portion of the economic value and voting power embodied in the minority interest[.]"[251]

Gentile described this phenomenon as "redistribution"; Fischel described it as "reallocation." Either way, the points are similar—dilutive equity issuances that increase a controller's stake and decrease the minority's stake run the risk of harming the minority.

In explaining the decision's apparent tension with *Tooley*, the *Gentile* court noted that

> in the typical corporate overpayment case . . . [s]uch claims are not normally regarded as direct, because any dilution in value of the corporation's stock is merely the unavoidable result (from an accounting standpoint) of the reduction in the value of the entire corporate entity, of which each share of equity represents an equal fraction.[252]

The court continued, stating that "[a]lthough the corporation suffered harm (in the form of a diminution of its net worth), the minority shareholders also suffered a harm that was unique to them and independent of any injury to the corporation"[253] by way of "a breach of a fiduciary duty owed to them by the controlling shareholder, namely, not to cause the corporation to effect a transaction that would benefit the fiduciary at the expense of the minority shareholders."[254]

---

[250] *Id.*

[251] *Id.* (emphasis added).

[252] *Id.* at 99.

[253] *Gentile*, 906 A.2d at 102–103.

[254] *Id.* at 103.

The reasoning of *Gentile* was sound enough, but it "led to doctrinal confusion in [Delaware] law."[255] In that way, it stymied one of the policy goals of *Tooley*, which was to create an easy-to-apply test delineating derivative and direct claims. Accordingly, the Delaware Supreme Court cabined the holding of *Gentile* in *El Paso Pipeline*[256] and ultimately overruled *Gentile* in *Brookfield*.[257]

*Brookfield* involved a private placement of stock to the controlling stockholder of TerraForm Power, Inc., which the stockholder plaintiffs alleged undervalued the stock and diluted both the financial and voting interests of the minority stockholders.[258] After the plaintiffs filed their complaint, the controlling stockholder acquired TerraForm's remaining shares in a merger.[259] The defendants moved to dismiss the complaint for lack of standing, arguing that dilution claims are "quintessential derivative claims" under the *Tooley* test and that they had been extinguished by the merger.[260] The trial court agreed that the plaintiffs failed to state direct claims under *Tooley* but denied the motion to dismiss on the ground that the plaintiffs stated a direct claim under *Gentile*.[261]

---

[255] *Brookfield*, 261 A.3d at 1274.

[256] 152 A.3d at 1248.

[257] 261 A.3d at 1251.

[258] *In re TerraForm Power, Inc. S'holders Litig.*, 2020 WL 6375859, at *9 (Del. Ch. Oct. 30, 2020), *rev'd sub nom. Brookfield,* 261 A.3d 1251.

[259] *Id.* at *7.

[260] *Id.* at *1.

[261] *Id.* at *16.

On appeal, the high court overruled *Gentile.* The court stated plainly that corporate overpayment claims are "categorically derivative, rather than dual natured, even when asserted against a controlling stockholder."[262] The court rooted its analysis in two lines of reasoning. First, the court held that *Gentile* did not properly apply the *Tooley* test. Under the court's analysis, the critical *Tooley* question was whether the economic and voting dilution were independent from the harm imposed on the company. Second, the court reasoned that the holding of *Gentile* was "superfluous" because "other legal theories [such as] *Revlon* provide a basis for a direct claim for stockholders to address fiduciary duty violations in a change of control context."[263]

What can be said of *Brookfield*? As Defendants' response to the intrinsic-value theory reveals, excessive equity compensation most clearly harms the minority stockholders by diluting their interests. There are good reasons to conclude, therefore, that *Brookfield* reflects an imperfect application of economic theory.[264] But *Brookfield* was born of salutary policy and practical concerns. As a policy matter, *Brookfield* reinforced Delaware's board-centric model by requiring stockholder plaintiffs to meet the demand requirement to pursue overpayment and dilution claims. As a practical matter, *Brookfield* supplied a bright-line rule that allowed litigants to more accurately predict when the demand requirement would apply and

---

[262] *Brookfield*, 261 A.3d at 1275.

[263] *Id.* at 1276.

[264] *See generally No Exceptions*, *supra* n.221, at 23–26.

spared trial courts significant amounts of hair-splitting. Any theoretical harms inflicted by *Brookfield*, therefore, are tolerable casualties in the pursuit of these beneficial goals.

Defendants' form-over-substance criticism, however, elevates the tolerable imperfections of *Brookfield* above its beneficial features. Defendants would extend the holding of *Brookfield* to prohibit a trial court from considering investor-level benefits caused by derivative litigation when awarding fees. Because the investor-level benefits are often the primary benefit in those cases, Defendants' rule would eliminate compensable recovery for this category of derivative suits. That would effectively eliminate any incentive for contingent-fee attorneys to pursue these claims. And contingent-fee attorneys are presently the only persons incentivized to bring these claims. Thus, Defendants' position would eliminate fiduciary challenges and their attendant deterrent effect in a large category of executive compensation transactions. That would be bad.

It is a good thing, therefore, that Defendants' position is not Delaware law. *Brookfield* does not demand that this court ignore investor-level benefits when valuing benefits of derivative lawsuits for the purpose of awarding attorney's fees.

As the Delaware Supreme Court explained in *Tandycrafts*, "the form of suit is not a deciding factor [in awarding attorney's fees]; rather, the question to be determined is whether a Plaintiff, in bringing a suit either individually or

64

representatively, has conferred a benefit on others."[265]  And, under Delaware law, investor-level benefits are a proper basis for compensating derivative counsel.  "The transitive property of entity litigation recognizes that a derivative action that asserts claims for breaches of fiduciary duty . . . and an investor class action that asserts similar theories . . . can be functionally equivalent and, therefore, substitutes."[266]  In other words, "an entity-level recovery can be the equivalent of an investor-level recovery and *vice versa*" and one can be "reframed" as the other.[267]  Indeed, under these principles, derivative actions are routinely resolved "using investor-level relief."[268]

---

[265] 562 A.2d 1162, 1166 (Del. 1989) (quoting *Reiser v. Del Monte Props. Co.,* 9th Cir., 605 F.2d 1135, 1139–40 (1979)).

[266] *Baker v. Sadiq*, 2016 WL 4375250, at *1 (Del. Ch. Aug. 16, 2016); *see also Goldstein v. Denner*, 2022 WL 1797224, at *19 (Del. Ch. June 2, 2022) ("[T]he functional and equitable equivalent of an entity-level recovery can be an investor-level recovery in which the injured investors receive their *pro rata* share of the amount that otherwise would go to the entity.").

[267] *Baker*, 2016 WL 4375250, at *1.

[268] *Id.* at *1–3 (collecting cases); *see also, e.g.*, *Fishel v. Liberty Media Corp.*, C.A. No. 2021-0820-KSJM, Dkt. 346 at 43 (Del. Ch. Apr. 8, 2024) (TRANSCRIPT) ("Damages on the derivative claims would have gone to Sirius XM. Minority stockholders would not necessarily have received benefits as a consequence.  The proposed settlement avoids this result by paying the settlement fund directly to minority stockholders."); *Lacey v. Larrea Mota-Velasco*, C.A. No 11779-VCG, Dkt. 161 at 8–10 (Del. Ch. Dec. 27, 2018) (TRANSCRIPT) (deploying transitive property to settle derivative actions using investor-level relief); *Montgomery v. Erickson Inc.*, C.A. No. 8784-VCL, Dkt. 189 at 7 (Del. Ch. Sept. 12, 2016) (TRANSCRIPT) (same); *In re Clear Channel Outdoor Hldgs., Inc. Deriv. Litig.*, Consol. C.A. No. 7315-CS, Dkt. 97 (Del. Ch. Sept. 9, 2013) (TRANSCRIPT) (same); *In re Freeport-McMoRan Copper & Gold Inc. Deriv. Litig.*, Consol. C.A. No. 8145-VCN, Dkt. 265 (Del. Ch. Apr. 7, 2015) (TRANSCRIPT) (same); *Franklin Balance Sheet Inv. Fund v. Crowley*, 2007 WL 2495018 (Del. Ch. Aug. 30, 2007) (same); *Gerber v. EPE Hldgs. LLC*, C.A. Nos. 5989-VCN, Dkt. 103 (Del. Ch. July 1, 2014) (TRANSCRIPT) (same).

For this reason, Defendants' form-over-substance criticism fails.

### ii.     The Event-Study Criticism

Defendants next argue that there is no market evidence of the value of rescission to Tesla or its stockholders to support the reverse-dilution argument. This argument rests on event studies prepared by Professors Grenadier and Fischel, respectively.

An event study is an empirical analysis of the effect, if any, of an event on the value of a security. The analysis tracks the relationship between actual returns of a baseline reference (a market or industry index) and a company's stock to identify abnormal or residual returns at a given time.[269]

Both the Grenadier and Fischel studies assessed the effect of the Post-Trial Opinion on Tesla's stock. Each expert posited that, if the reverse-dilution theory was accurate, then Tesla's market capitalization would have increased at the announcement of the Post-Trial Opinion. There was no statistically significant price reaction to the Post-Trial Opinion, however, leading both experts to opine that there was no dilution and no reverse dilution.[270]

Those opinions are flawed for many reasons. Most obviously, they fail to reflect significant value-relevant information. Event studies rest on the efficient-market

---

[269] This statement no doubt oversimplifies the art. For a more precise description of the analysis, see generally Fischel Decl. ¶ 32; Grenadier Decl. ¶ 32. *See also* Sagar P. Kothar and Jerold B. Warner, "Econometrics of Events Studies," *Handbook of Empirical Corporate Finance: Empirical Corporate Finance vol. 1*, Elsevier (2007), 3-36, at 9 (quoted at Fischel Decl. ¶ 32 n.59).

[270] Grenadier Decl. ¶¶ 41–42; Fischel Decl. ¶ 34.

hypothesis—more specifically, the semistrong-form efficient market hypothesis—which asserts "that security prices adjust rapidly to the release of all public information."[271] An event study assumes the absence of "confounding news" or "other value-relevant information released during the same period."[272] Event studies are most helpful in addressing market reactions to isolated financial and earnings-related disclosures. But in complex fact patterns with multiple confounding factors, event studies can be unreliable.[273]

Neither Professors Grenadier nor Fischel investigated the effect on their study of negative information available at the time of the Post-Trial Opinion. And there were many possible confounding factors. For example, in addition to ordering rescission, the Post-Trial Opinion revealed severe Board conflicts and deficiencies in Tesla's corporate governance.[274] Moreover, Musk made statements before and right after the Post-Trial Opinion that could have offset the positive benefits from rescission. Specifically, in mid-January, Musk stated that he would not let Tesla grow to be a leader in artificial intelligence and robotics without a 25% voting

[271] Grenadier Decl. ¶ 30 (quoting F. K. Reilly and K. C. Brown, *Investment Analysis and Portfolio Management*, p.178 (7th ed. 2003)).

[272] *Id.* at ¶ 32.

[273] *See, e.g.*, *Mudrick Capital Mgmt. v. Monroe*, C.A. No. 2018-0699-TMR, Dkt. 100 at 21 (Del. Ch. Sept. 5, 2019) (TRANSCRIPT) (rejecting event study as "unreliable" basis for valuing settlement); *see also In re Stillwater Mining Co.*, 2019 WL 3943851, at *56 (Del. Ch. Aug. 21, 2019) (rejecting event studies in favor of "a superior market-based metric, like the deal price"); *Highfields Cap., Ltd. v. AXA Fin., Inc.*, 939 A.2d 34, 58 (Del. Ch. 2007) (rejecting event study based on "highly speculative" assumptions).

[274] Post-Trial Op., 310 A.3d at 508–26.

stake.[275]  And within minutes of the Post-Trial Opinion, Musk released a statement reflecting his rejection of the decision and his intent to cause Tesla to reincorporate under Texas law.[276]  These statements introduce a number of confounding factors based on possible—even probable—future events, including that Tesla might grant Musk more shares or seek to nullify enforcement the Post-Trial Opinion.[277]

Analysts took note of this negative information, but Defendants' experts disregarded it.[278]  Fischel testified he did not analyze the stock price reaction to

[275] Elon Musk (@elonmusk), X f/k/a Twitter (Jan. 15, 2024, 12:55 PM), https://x.com/elonmusk/status/1746999488252703098 ("I am uncomfortable growing Tesla to be a leader in AI & robotics without having ~25% voting control."), *see also* Elon Musk (@elonmusk), X f/k/a Twitter (Jan. 3, 2024, 12:51 AM), https://x.com/elonmusk/status/1742423298217033776 ("Tesla is an AI/robotics company that appears to many to be a car company"); Elon Musk (@elonmusk), X f/k/a Twitter (Apr. 27, 2024, 8:13 PM), https://x.com/elonmusk/status/1784375472887066653 ("Tesla is the biggest AI project on earth").

[276] *See, e.g.*, Elon Musk (@elonmusk), X f/k/a Twitter (Jan. 30, 2024, 5:14 PM), https://x.com/elonmusk/status/1752455348106166598; Elon Musk (@elonmusk), X f/k/a Twitter (Jan. 30, 2024, 7:40 PM), https://twitter.com/elonmusk/status/1752491924848820595; Elon Musk (@elonmusk), X f/k/a Twitter (Feb. 1, 2024, 12:09 AM), https://twitter.com/elonmusk/status/1752922071229722990.

[277] *See, e.g.*, Proxy Statement at 87 ("The Special Committee also noted that if the 2018 CEO Performance Award is not ratified, then Tesla may need to negotiate a replacement compensation plan with Mr. Musk in order to motivate him to devote his time and energy to Tesla . . . And any new plan would, of course, require Mr. Musk to agree to the terms and amount. Although the Special Committee expressly and consciously did not negotiate (or renegotiate) with Mr. Musk about his compensation, it expects from its interview with him that, for Mr. Musk to agree to it, any new plan would need to be of a similar magnitude to the 2018 CEO Performance Award.").

[278] *Compare* Fischel Decl. ¶36 ("We also reviewed analyst and market commentary on the Ordered Rescission . . . None of the analyst reports that we reviewed identified the Ordered Rescission as generating a multibillion dollar gain for Tesla and its stockholders."); 7/8/24 H'rg Tr. at 111:2–4 (Fischel) ("[T]he Court's [Post-Trial]

68

Musk's threat to divert AI and robotics away from Tesla.[279]  Grenadier admitted that "of course" a potential new compensation package for Musk could move the market for Tesla stock by $50 billion,[280] and acknowledged the possibility that Musk losing focus linked to AI could move the market by $50 billion.[281]  Grenadier further concluded that the lack of market movement in response to dilution reversal was likely due to "Musk's desire to be compensated," which the "stock price reaction took . . . into account."[282]  According to Grenadier, once the market digested the Post-Trial Opinion, it concluded that Musk would be an "unhappy camper"[283] who would demand replacement compensation that would wipe out rescission's reverse-dilution effect.[284]

---

opinion on the value of Tesla is neutral. You can't say it's either positive or negative."); Grenadier Decl. ¶ 38 ("[T]he Opinion and a rescission of the 2018 Grant were not anticipated by the market.  Thus, I am comfortable applying  event study to assess the market's reaction to the opinion.") *with* Wedbush, *In a Shocker Delaware Judge Voids Musk Comp Package; Next Move in Board's Hands* (Jan. 31, 2024) (writing that the Post-Trial Opinion "creates a tornado situation for Tesla's Board in the next move with the Street closely watching this poker move"); CRA Insights Finance, *The Stock Price That Didn't React: Tesla Reaction to Court's Ruling*, (Feb. 2024) (speculating that Tesla's Board might seek to replace the rescinded Grant "with a substantial replacement compensation package," that Musk's redomestication demand might affect the share price, and that Musk's threat to shift his AI and robotics focus elsewhere absent a 25% Tesla stake—which carried particular force given Musk's characterization of AI and robotics as Tesla's essence and future—"could also cause the market to reduce Tesla's value").

[279] Fischel Dep. Tr. at 238:24–240:1.

[280] Grenadier Dep. Tr. at 182:2–6.

[281] *Id.* at 181:16–182:1.

[282] *Id.* at 141:14–21.

[283] *Id.* at 84:20–85:1.

[284] Grenadier Dep. Tr. at 83:13–18.

Defendants respond to the confounding-news argument in two ways. First, they argue that Musk's statements did not qualify as confounding information, foremost because they were stale. They note that, with more than 90 analysts, Tesla is one of the most highly followed stocks in the country.[285] Musk's 25%-voting-stake statement was made two weeks before the Post-Trial Opinion.[286] So, the trading price would have already reflected that information as of the date of the Post-Trial Opinion, they say.[287] But the 25%-voting-stake statement was not stale in the sense it was irrelevant at the time of the Post-Trial Opinion. Rather, the Post-Trial Opinion made Musk's 25%-voting-stake statement highly relevant because it introduced the possibilities that Tesla would hand him more shares or that Musk will take the AI business elsewhere.

Second, Defendants argue that it is categorically wrong to describe Musk's statement as confounding information, even if it gained new valence in light of the Post-Trial Opinion. Professor Fischel testified that "[c]onfounding information means information that's completely unrelated to the events in question."[288] In this sense, the possible reactions to the Post-Trial Opinion introduced by Musk's statements are not confounding; rather, they a "direct result of how market

---

[285] 7/8/24 Hr'g Tr. at 58:20–59:2.

[286] Elon Musk (@elonmusk), X f/k/a Twitter (Jan. 15, 2024, 12:55 PM), https://x.com/elonmusk/status/1746999488252703098 ("I am uncomfortable growing Tesla to be a leader in AI & robotics without having ~25% voting control. Enough to be influential, but not so much that I can't be overturned.").

[287] 7/8/24 Hr'g Tr. at 116:6–11 (Fischel).

[288] *Id.* at 114:13–17 (Fischel).

participants interpreted the Court's opinion[.]"[289]   Taking this logic further, Defendants suggest that Musk's immediate reaction to the Post-Trial Opinion, or the severe governance defects revealed by the Post-Trial Opinion, were not confounding either. Rather, they too were part and parcel of the relevant event. In essence, Defendants argue that any publicly stated thoughts, reactions, or threats concerning a court decision is just part of the event under examination.

Even if Defendants' approach were correct as a matter of methodology, it would make for awful public policy, because it would create an incentive for all the unhappy campers found to have breached their fiduciary duties to further misbehave when news of their wrongdoing becomes public. After being held liable, fiduciaries could offset the benefit by threatening further harm. If Defendants are correct as to how event studies work, therefore, then that is another reason to disregard them in this context.

In fairness, Defendants' experts took on a challenging objective. As Professors Bebchuk and Jackson explained, "Tesla['s] stock price is very volatile, which makes it difficult even for effects of substantial magnitude to result in statistically

---

[289] *Id.* at 116:12–19 (Fischel); *see also id.* at 115:8–9 (Fischel).

significant returns."[290]  In this environment, even large and obvious benefits could result in no statistically significant change.[291]

So, there are plenty of reasons to be skeptical of Defendants' event-study argument, and the court does not rely on it for the purpose of setting fees.

### iii.    The Ex-Post Criticism

Defendants also attack the reverse-dilution theory as an improper *ex-post* measure of value, arguing that the value of rescission should be measured by comparing Tesla's positions immediately before and after the Grant.  Defendants assert that an *ex-ante* approach to valuing fees is consistent with the goal of rescission, which is to "restore the parties substantially to the position they occupied before the challenged transaction."[292]  According to Defendants, Plaintiff's approach produces absurd results because it would lead to inconsistent application of law.  They further argue that the *ex-post* approach compensates Plaintiff's counsel for a benefit that they did not cause—the increase in share value that occurred after the litigation commenced.

---

[290] Pl.'s Reply Fee Br. at 29; *see also* 7/8/24 Hr'g Tr. at 53:20–54:1 (Jackson) ("This is a highly volatile publicly traded security.  In fact, if you study the t-statistics in the event studies that are presented by the defendants and others in the case, you'll see that the errors are so large that quite substantial benefits could result in no statistically significant change.").

[291] *See, e.g.*, 7/8/24 Hr'g Tr. at 53:13–54:1 (Jackson).

[292] Post-Trial Op., 310 A.3d at 448; *see also Hegarty v. Am. Comm. Power Corp.*, 163 A. 616, 619 (Del. Ch. 1932) (rescission "regard[s] the contract as never having been entered into").

Defendants are correct that the goal of rescission is to restore the parties to the position that they occupied before the challenged transaction. This is accomplished, however, by returning the consideration that the parties exchanged. For this purpose, it is valued at the time of judgment. Likewise, when rescissory damages are awarded, damages are typically calculated at the time of the judgment, not at the time of the wrong. [293] An *ex-post* approach to valuing fees, therefore, is not inconsistent with the goal of rescission. In fact, it is a common approach of this court when awarding attorney's fees in the settlement context.[294]

---

[293] *In re Orchard Enterprises, Inc. S'holder Litig.*, 88 A.3d 1, 38 (Del. Ch. 2014) (holding that rescissory damages are the "monetary equivalent of rescission," "available for an adjudicated . . . loyalty [breach], such as cases involving self-dealing or where a fiduciary puts personal interests ahead of the interests of its beneficiary" and "can be measured at the time of judgment, the time of resale, or at an intervening point when the stock had a higher value and remained in control of the disloyal fiduciary").

[294] *See Alpha Venture Capital P'rs LP v. Pourhassan*, C.A. No. 2020-0307-PAF, Dkt. 76 at 54–56 (Del. Ch. June 4, 2021) (TRANSCRIPT) (rejecting defendants' argument that cancelled stock options and warrants were unquantifiable benefits to the company and that plaintiff's fair market valuation represented the benefit surrendered by defendants and not the benefit obtained by the company); *Wilcox v. Dolan*, C.A. No. 2019-0245-SG, Dkt. 47 at 13, 31 (Del. Ch. Sep. 8, 2020) (TRANSCRIPT) (awarding fees based on the "present value of around $31 million" in a settlement challenging a "one-time signing grant with a grant date fair value of $40 million" and certain performance stock units); *In re Compellent Techs., Inc. S'holder Litig.*, 2011 WL 6382523 (Del. Ch. Dec. 9, 2011) (measuring the benefit conferred by settlement "as of the time [the settlement] was agreed to"); *Moses v. Pickens*, WL 17825, at *1 (Del. Ch. Nov. 10, 1982) (valuing surrendered stock options at approximately $4 million based on the difference between the $11.50 exercise price and the $15–$17 current trading price of the shares); *Wietschner v. Rapid-Am Corp.*, 1977 WL 918, at *4 (Del. Ch. Jan. 19, 1978) (valuing cancelled stock options at $300,000 based on their "present relinquishment value to the corporation as well as a possessory value" to the option holders of $1.00 per option).

In any event, Defendants conflate the goal of rescission with the goal of setting a fee award. The former is to restore the parties to their pre-transaction position. The latter is to reward representative counsel for benefits achieved through litigation. For the latter purpose, the court attempts to quantify the current value of those benefits.

Each side argues that the other's position produces an absurd result. They both advance their arguments through the following hypothetical:

> [C]onsider an options grant that was given and had a certain grant-date fair value, and consider two scenarios. In the first, the stock price rose steeply after the award of the grant, leading to a dramatic increase in the grant's economic value. In the second scenario, the stock price plummeted, bringing it to a level far below the Strike Price and making the options practically worthless and expected to expire without use. Suppose now that in both scenarios the options were cancelled by litigation focusing on serious flaws in the process by which the options were granted.[295]

Under Plaintiff's *ex-post* approach, the same litigation efforts of the same counsel obtaining cancellation of the same grant would result in a sizeable fee award in the first scenario and nothing in the second.[296] Defendants say that is absurd. Under Defendants' *ex-ante* approach, the value ascribed to cancellation for the purpose of awarding fees in the above hypothetical is the same in both scenarios, although the economic consequences are dramatically different.[297] Plaintiff says that is absurd.

---

[295] Bebchuk & Jackson Decl. ¶ 67.

[296] Fischel Decl. ¶ 48.

[297] Bebcuk & Jackson Decl. ¶ 67; Defs.' Ans. Fee Br. at 31.

Plaintiff has it right. What Defendants ignore and Plaintiff gets is that, under Delaware law, fee awards in representative litigation are not intended to reward effort. They are intended to reward results. This is why the primary factor under *Sugarland* is the results achieved.[298] As a general matter, the *ex-post* approach is best suited to realize this goal. For the contingent-fee attorney, a lawsuit is a "continuing investment decision,"[299] not a one-shot decision at the outset of the case (to sue or not to sue). The *ex-ante* approach pegs the investment decision to a stale mark, which creates an economic incentive for plaintiff's counsel to chase claims that might result in no ultimate value.

The "second scenario" discussed above illustrates the point. Again, the hypothetical is that the stock price plummeted, making the options practically worthless, and the court rescinded the Grant. Under Defendants' approach, the court would still value rescission for the purpose of setting fees based on the GDFV which, as this case illustrates, could be sizeable. That would incentivize a plaintiff to pursue

---

[298] *Sugarland*, 420 A.2d at 152; *see also Dell Chancery*, 300 A.3d at 692 ("The primary factor is the results achieved."); *Americas Mining*, 51 A.3d at 1255 (identifying benefit achieved as "the first and most important of the *Sugarland* factors"); *Dow Jones & Co. v. Shields*, 1992 WL 44907, at *2 (Del. Ch. Jan. 10, 1992) ("Delaware courts have not given as much emphasis to the time spent by the attorneys as the federal courts have done. The primary emphasis in Delaware has been on the value of the benefit obtained by the litigation. The most important factor considered by the Court, therefore, . . . was the value of the result achieved by counsel.") (internal citations omitted); *In re North American Philips S'holders Litig.*, 1987 WL 28434 at *1 (Del. Ch. Dec. 16, 1987) ("[T]he primary consideration is generally the result achieved through the litigation.").

[299] *See generally* John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions*, 86 Colum. L. Rev. 669, 685, 702 (1986).

claims to rescind worthless options of no value to anyone. That is not good policy. By contrast, by awarding fees based on the value achieved at the conclusion of litigation, Delaware law ensures that plaintiff's counsel's investment decisions align with delivering economic value to the company or class they represent. Of course, there might be reasons to deviate from an *ex-post* approach, such as where it results in a windfall, as discussed next.

### c. The Windfall Problem

Plaintiff thus offers two paths toward a $51 billion valuation of the benefit achieved. The court need not rule on the merits of the intrinsic-value theory, because the reverse-dilution theory gets to the same result. Defendants' criticisms of the reverse-dilution theory are not persuasive because they elevate form over substance, depend on unreliable event studies, and would contort the incentive structure of *Americas Mining* to promote litigation that might have no actual value.

Still, Plaintiff's approach has a massive ($5.6 billion) problem. This discussion began with the Delaware Supreme Court's query—"whether the public would ever believe that lawyers must be awarded many hundreds of millions of dollars in any given case to motivate them to pursue representative litigation or to discourage counsel from settling cases for less than they are worth."[300] The value of Plaintiff's fee request—$5.6 billion—is *many* hundreds of millions beyond what is necessary to

---

[300] *Dell Appeal,* 2024 WL 3811075, at *12.

motivate attorneys to pursue representative litigation and discourage counsel from settling a case for less than it is worth.[301]  It is a classic windfall.

There is no good way to fix the windfall problem within the parameters of Plaintiff's approach.  The solution commonly deployed by federal courts—the declining-percentage method—does not work here.  That method reduces the percentage of the fund awarded to counsel as recoveries approach $500 million.[302]  At that level, percentages fall on a sliding scale to as low as 11%.[303]  Recently, in *Dell*, the high court held that this court has the discretion to adopt a declining percentage.[304]  But Plaintiff's 11% ask is already at the lowest end of the range applied under that method.  And even at 11%, Plaintiff's approach generates a fee award of $5.6 billion—far greater than the "many hundreds of millions of dollars" amount about which *Dell* cautioned.  The windfall risk flows not from the selected percentage.  It stems from the sheer magnitude of the compensation plan that Plaintiff successfully challenged.[305]

In search of a defensible valuation approach that avoids the windfall problem, the analysis turns to Defendants' arguments.

---

[301] *Americas Mining*, 51 A.3d at 1262–63 (awarding more than $304 million in fees on a judgment of more than $2 billion in damages).

[302] *See Dell Appeal*, 2024 WL 3811075, at *11; *Dell Chancery*, 300 A.3d at 700; *Americas Mining*, 51 A.3d at 1260–61.

[303] *Americas Mining*, 51 A.3d at 1260.

[304] *Dell Appeal*, 2024 WL 3811075, at *11 (holding that "it is *not* inconsistent with the incentive structure in *Americas Mining* for the court to decrease the percentage of fees in a megafund case" (emphasis added)).

[305] Post-Trial Op., 310 A.3d at 538.

### 2. Defendants' Position

Defendants advance three arguments concerning attorney's fees. Their most aggressive argument is that the Stockholder Vote "effectively mooted" the result of the litigation, eliminating any value of from the rescission.[306] In a version of this argument, they urge the court to consider the "replacement value" of the compensation package.[307] According to Defendants, Plaintiff could take credit for causing a fully informed Stockholder Vote, and the court could award fees to Plaintiff's counsel based on that and other therapeutic benefits generated by the Post-Trial Opinion. But the court may not award fees for causing rescission. This decision refers to this point as the "mootness argument."

Defendants next urge the court to adopt a *quantum meruit* approach. They say that the stage-of-case approach requires that Plaintiff prove the value of the litigation to Tesla with some degree of certainty. Short of that, Delaware law requires a *quantum meruit* approach to fee awards. In this case, Defendants propose awarding fees no greater than four times Plaintiff's lodestar. This decision refers to Defendants' second argument as the "*quantum meruit* argument."

Last, as a fallback, Defendants say that the only sound valuation metric is to allow the $2.3 billion grant date fair value to supply the value of rescission. This decision refers to Defendants' last argument as the "GDFV argument."

---

[306] 8/2/24 Hr'g Tr. at 128:20.

[307] Defs.' Ans. Fee Br. at 32–33, 42.

### a. The Mootness Argument

Defendants argue that because the Grant "is valid as ratified," "the relief requested in this action is moot," and thus the rescission Plaintiff obtained has no value to support a fee award.[308] This argument rises or falls with the Ratification Argument, and it thus falls.

Nor does the court consider the "replacement value" of any compensation package at this stage. The Post-Trial Opinion held that the Board and Musk breached their fiduciary duties when negotiating the Grant—it did not say that Musk should not be paid for his service to Tesla. Tesla and Musk could have argued during the litigation that a particular alternative compensation package was fair and that the court only should rescind the excess, but they opted for an all-or-nothing defense. After the Post-Trial Opinion, they could have negotiated a true replacement package for Musk, with any fiduciary challenges to that Board decision likely landing in Texas court. Instead, Defendants attempted to re-approve the *exact same* compensation package under made-up theories of Delaware law. For the purposes of this decision, they do not get credit for it.[309]

---

[308] Dkt. 409 (Tesla Joinder to Defs.' Reply Ratification Br.) at 10–11.

[309] *See David J. Shepard v. David Simon et al.*, C.A. No. 7902-VCL, Dkt. 103 (Order Granting Awards of Attorney's Fees and Expenses) at ¶ 4 ("If the plaintiffs had obtained a decision from the court on the merits that invalidated the [o]riginal [a]ward, then the facts would be different . . . The plaintiffs therefore would be entitled to have the benefits measured by the value of the full amount of the [o]riginal [a]ward.").

## b.       The *Quantum Meruit* Argument

Defendants acknowledge—as they must—that Delaware law favors the stage-of-case approach. They argue, however, that this preference only applies when the plaintiff has proven with some degree of certainty the value of the benefit achieved;[310] otherwise, *quantum meruit* applies.

Defendants say that *quantum meruit* must govern here because Plaintiff "has not proven the value of any benefit," which this decision refers to as the "uncertainty argument." They also invoke case law where the court awarded fees on a *quantum meruit* basis for rescission, which this decision refers to as the "precedent-based argument."[311] Last, and without much by way of explanation, Defendants say that Plaintiff's counsel should receive no more than 4x their lodestar under the *quantum meruit* approach, which this decision refers to as the "4x argument."

The uncertainty argument fails for a few reasons. For starters, as the reverse-dilution theory shows, the benefit of rescission can be quantified. It is the size of the result and not the uncertainty of it that creates problems with that approach. Moreover, Defendants' conclusion (that the court *must* apply *quantum meruit*) does not flow from the premise (that rescission is difficult to quantify). Valuing non-monetary benefits can be difficult, but that does not mean that this court automatically reverts to *quantum meruit*. Rather, because "the criticisms of the

---

[310] Defs.' Ans. Fee Br. at 18–20.

[311] *Id.* at 38–42.

lodestar method apply equally to therapeutic benefit cases,"[312] "only if the court lacks any yardstick to value a therapeutic benefit should a court fall back to the *quantum meruit* version of the lodestar approach."[313] Unsurprisingly, this court has previously found a way to ascribe a value to rescission for the purpose of awarding attorney's fees.[314]

The precedent-based argument too is problematic, because the cited precedents do not support Defendants' position.[315] Defendants rely on three rulings awarding fees for mooting a case or as settlement: one opinion (*Louisiana State Employees' Retirement System v. Citrix Systems, Inc.*)[316] and two bench rulings (*In re Cheniere Energy, Inc.* and *In re Investors Bancorp, Inc.*).[317]

In *Citrix*, a stockholder plaintiff sued to invalidate an amendment to an issuer's stock option plan on grounds of voting manipulation and disclosure violations.[318] The plan was put to a stockholder vote at the company's annual meeting and would have failed had the polls closed on the meeting date. The company

---

[312] *Sciabacucchi v. Salzberg*, 2019 WL 2913272, at \*6 (Del. Ch. July 8, 2019), *rev'd on other grounds* 227 A.3d 102 (Del. 2020).

[313] *Id.*

[314] *See, e.g.*, *In re Compellent Techs., Inc., S'holder Litig.*, 2011 WL 6382523 (Del. Ch. Dec. 9, 2011).

[315] Defs.' Ans. Fee Br. at 38 ("This case is governed by the numerous cases finding that fees for rescission results should be awarded under *quantum meruit*.").

[316] 2001 WL 1131364 (Del. Ch. Sept. 19, 2001).

[317] C.A. Nos. 9710-VCL, Dkt. 77 (Del. Ch. Mar. 16, 2015) (TRANSCRIPT) ("*Cheniere Settlement*"); *In re Invs. Bancorp, Inc. S'holder Litig.*, C.A. No. 12327-VCS, Dkt. 253 (Del. Ch. June 17, 2019) (TRANSCRIPT) ("*Invs. Bancorp Settlement*").

[318] *Citrix*, 2001 WL 1131364, at \*1.

reconvened the annual meeting later, however, and closed the polls only after securing stockholder approval by a margin of 1% of the votes cast. The parties moved to stay the Chancery litigation in favor of a federal securities action. Before the court took any action on the parties' joint motion, the defendants withdrew the challenged amendment, in part due to developments in litigation involving nearly identical claims.[319]

The parties agreed that, by withdrawing the challenged amendment, the defendants mooted the plaintiff's claim. The plaintiff claimed that this generated a benefit of $183 million. To reach this number, the plaintiff argued that mooting the action prevented dilution from all the options that would have been created by the amendment, which they valued using the Black-Scholes model.[320]

The court credited the plaintiff's counsel with achieving a corporate benefit but rejected the plaintiff's approach to valuing that benefit. The court reasoned, foremost, that rescission did not reverse dilution because no options were ever issued under the amendment.[321] The court also inserted its own business judgment into the mix, reasoning that any benefit from withdrawing the options plan should be offset by the negative effects that doing so had on employee recruitment, retention, and motivation, which were difficult to quantify.[322] Citing concerns of uncertainty, the

---

[319] *Id.* at *2–3 (discussing the implications of *Peerless*, 2000 WL 1805367).

[320] *Id.* at *7.

[321] *Id.* at *7, 9.

[322] *Id.* at *8 ("As the defendants correctly recognize, any attempt to accurately value the net economic benefit conferred by either the passage or the withdrawal of

court adopted a *quantum meruit* approach to the *Sugarland* factors in estimating a reasonable fee, and applied a premium of 100% to plaintiff's counsel's billing rates.[323]

In *Cheniere*, a stockholder plaintiff challenged an employee equity compensation plan on technical grounds, claiming that the company's management incorrectly applied a votes-cast methodology when determining that stockholders approved an amendment to the plan.[324] The plaintiff asserted both legal and fiduciary claims, and the defendants responded by filing an action to validate the challenged amendment under 8 *Del. C.* § 205.[325] The defendants then moved to dismiss or stay the stockholder suit pending resolution of the Section 205 action.

Before the court took any action on the defendants' motion, the parties reached a comprehensive settlement. Among other things, the company agreed not to seek stockholder approval for further equity issuances for compensation purposes for a period of three years.[326] The settlement, however, allowed the company to provide non-equity-based compensation during that period.[327] The plaintiff moved for fees,

---

Proposal 3 is at best an inexact science. . . . Quantitatively speaking, any attempt by this Court to directly calculate the precise value of the employee recruitment, retention, and motivation effects provided by Proposal 3 seems more like ill-conceived alchemy than science.").

[323] *Citrix*, 2001 WL 1131364, at *10 n.56.

[324] *In re Cheniere Energy Inc. S'holders Litig.*, C.A. No. 9710-VCL, Dkt. 1, ¶¶ 64–96.

[325] *In re Cheniere Energy Inc. S'holders Litig.*, C.A. No. 9766-VCL, Dkt. 1. The plaintiff also claimed that the defendants breached their fiduciary duties in connection with the stockholder vote, but the court described that claim as a weak "backup" that likely "would have "fallen by the wayside" once the technical challenge was resolved. *See also Cheniere Settlement* at 92:6–93:4.

[326] *Cheniere Settlement* at 18:13–19.

[327] *Id.* at 94:20–95:6.

estimating a value of forgone equity compensation for the three-year period of over $1 billion based on the market value of the equity the company would have been authorized to issue over the three-year period.[328]

The court approved the settlement and awarded fees but rejected the plaintiff's approach to valuing the benefit achieved. Because the settlement allowed the company to issue other forms of equity to executives, the court rejected the plaintiff's argument that the value of the settlement equaled the value of potential equity-compensation that could have been issued during the three-year period. The court reasoned that any benefit should be reduced by "what people are going to get now, post-settlement, and what they would have gotten before."[329] Because those variables were unknown or unknowable, the court viewed the plaintiff's method of valuing the foregone equity compensation as overly speculative. The court awarded fees based on *quantum meruit*.[330] In reaching this conclusion, the court expressly cautioned that "[n]obody should see this as a ruling for all time" and stated that it was "happy to consider a better mousetrap in future cases."[331]

In *Investors Bancorp*, a stockholder plaintiff challenged approximately $50 million in compensation awards that the company's board of directors—comprising ten non-employee directors, the CEO, and the COO—granted themselves.[332]

[328] *Id*. at 21:10–15.

[329] *Id*. at 104:7–18.

[330] *Id*.

[331] *Id*. at 104:9–11.

[332] *Invs. Bancorp.,* 2017 WL 1277672, at *2–5.

Although the awards were made pursuant to an equity incentive plan approved by the company's stockholders, the plaintiff claimed that the awards were excessive acts of self-dealing and subject to review under the entire fairness standard. The trial court dismissed the complaint on the ground that the equity incentive plan by which the challenged awards were executed was approved by an informed stockholder vote and that the plan imposed meaningful limits on awards, thereby implicating the business judgment rule. The Delaware Supreme Court reversed on appeal, finding that the transaction was subject to entire fairness.

On remand, and two months before trial, the parties agreed to a settlement in which the corporate defendant cancelled the equity incentive compensation grants to two executives, subject to later board action to consider new equity grants to those same executives.[333] After the parties reached agreement, the company's compensation committee authorized and approved the issuance of replacement equity awards, which became effective only upon court approval of the pending settlement. The plaintiffs' counsel petitioned for fees, arguing that the benefit of the recovery should be the full value of the canceled grants. The defendants responded that an offset for the future replacement grants was appropriate.[334]

The court transparently struggled with whether to factor in the replacement compensation when valuing the benefit achieved, concluding, with some reservation, that it was appropriate to do so if the court based the fee award on the cancelled

---

[333] *Invs. Bancorp Settlement* at 9:21–10:1.

[334] *Id.* at 10:4–21.

equity. The court lamented that the parties had not "provide[d] a sound way to value the replacement awards," expressly grappled with *Citrix* and *Cheniere*, identified the perverse incentives considerations a replacement award would create in this context (including the possibility that a larger award would create a negative fund), and opted to avoid the issue altogether. The court expressed concern that "[r]educing the settlement fund by the value of the replacement awards would seem to punish plaintiffs for reaching a successful settlement *instead of going to trial*,"[335] and further echoed the call in *Cheniere* for a "better mousetrap."[336] The court ultimately avoided the common-fund approach altogether and awarded fees on a *quantum meruit* basis at a rate of twice the plaintiffs' counsel's lodestar.

So, what is one to make of Defendants' marquee authorities? There are only three. Only one is a decision; the others are bench rulings. A court need not instinctively recoil from reliance on bench rulings, but they are not the firmest ground on which to base a multibillion-dollar argument.[337]

---

[335] *Id.* at 19:19–20:3 (emphasis added).

[336] *Id.* at 22:15–23.

[337] *See S'holder Rep. Servs. LLC v. DC Cap. P'rs Fund II, L.P.*, 2022 WL 782307, at *3 (Del. Ch. Mar. 15, 2022) ("[T]his court is reticent to place precedential value on transcript rulings" but noting "they are often informative." (internal citation omitted)); *Focus Fin. P'rs, LLC v. Holsopple*, 250 A.3d 939, 961 (Del. Ch. 2020) ("[A] bench ruling typically reflects a case-specific determination that is intended for the parties, and by virtue of being spoken rather than written, its language and implications may be less clear. Compared to written decisions . . . the [bench] ruling starts at a disadvantage." (internal citations omitted)); *Day v. Diligence, Inc.*, 2020 WL 2214377, at *1 (Del. Ch. May 7, 2020) (holding that "[t]ranscript [r]ulings generally have *no* precedential value in this Court and they should ordinarily not be relied on as precedent—at most they offer persuasive authority" (emphasis in

86

On the merits, *Citrix* and *Cheniere* provide support for the notion that valuing cancelled compensation packages can prove difficult, but each involved materially different scenarios. No options had been issued in *Citrix*. And the foregone compensation in *Cheniere* was prospective only. These facts injected uncertainties into the fee calculation that are not present here.

*Investors Bancorp* is the most analogous of Defendants' three cases because it dealt with a past award. But *Investors Bancorp* is hardly a ringing endorsement of the *quantum meruit* approach. Although the court used it, the court did so reluctantly, noting that things might have been different with further briefing and called for a superior valuation method.

Atop these weaknesses is a more obvious one—each of the fee-award decisions relied on by Defendants were decided in mootness or settlement contexts and not post-trial. There are myriad reasons for viewing the post-trial scenario differently. For starters, this court encourages plaintiff's counsel to "go the distance" to trial when warranted,[338] just as this court encourages fiduciaries to moot or settle representative suits when appropriate. When fiduciaries settle or moot cases challenging compensation awards by adopting, or promising to adopt, a replacement compensation package that addresses the challenged legal or fiduciary issues, their efforts should be credited. By contrast, when defendants force representative plaintiffs to litigate a case through trial, the defendants bear the risk of plaintiffs'

original)); *see also* Joel E. Friedlander, *Performances Of Equity: Why Court Of Chancery Transcript Rulings Are Law*, 77 Bus. Law. 51 (Winter, 2021–22).

[338] *See Dell Chancery*, 300 A.3d at 694.

recovery and the subsequent fee award.[339]  Based on these distinguishing features

alone, Defendants' authorities do not carry the weight that Defendants place on

them.[340]

---

[339] *See David J. Shepard v. David Simon et al.*, C.A. No. 7902-VCL, Dkt. 103 (Order Granting Awards of Attorney's Fees and Expenses) at ¶ 4 ("If the plaintiffs had obtained a decision from the court on the merits that invalidated the [o]riginal [a]ward, then the facts would be different. . . . The plaintiffs therefore would be entitled to have the benefits measured by the value of the full amount of the [o]riginal [a]ward.").

[340] Defendants cite but do not discuss five other cases in their briefing.  They are all inapposite.  Defendants cite to *Knight v. Miller*, 2023 WL 3750376, at *5, 8 (Del. Ch. June 1, 2023) and *Krinsky v. Helfand*, 156 A.2d 90, 94 (Del. Ch. 1959), *aff'd* 156 A.2d 90 (Del. 1959) for the proposition that "unwinding equity compensation plans yields an inherently unquantifiable therapeutic benefit."  Defs.' Ans. Fee Br. at 38.  *Knight* rejected a settlement of claims that the court viewed as makeweight for governance reforms that the court deemed difficult to value.  *Krinsky* also involved the settlement of weak claims, but the court approved it.  As part of the settlement, the defendants agreed to cancel a fiduciary's options, and the parties disputed the value of that term. The court did not dilate extensively on this issue; rather, the court noted the "dispute," and said "[w]hile that value may not be measurable in dollars and cents, it certainly is a material factor in considering the terms of the settlement."  156 A.2d at 559.  Unlike *Knight* and *Krinsky*, this case did not settle, the claims were not weak, and the benefit of rescission is quantifiable.  Defendants cite to *Rovner v. Health-Chem Corp.*, 1998 WL 227908, at *5 (Del. Ch. Apr. 27, 2008) and *Cal-Maine Foods, Inc. v. Pyles*, 858 A.2d 927, 929–30 (Del. 2004) for the proposition that a court may resort to a *quantum meruit* approach when it lacks "a reliable method to value the net benefit conferred on the company."  Defs.' Ans. Fee Br. at 40.  In *Rovner*, the court expressed skepticism with a Black-Scholes pricing method when awarding mootness fees and leapt to a *quantum meruit* approach without meaningful analysis.  1998 WL 227808, at *5 & n.19.  In *Cal-Maine*, which also resolved mootness fees, the Delaware Supreme Court held that the trial court did not abuse its discretion when awarding fees where the benefit—an abandoned going private transaction—was difficult to quantify.  It is unclear whether the trial court adopted a *quantum meruit* approach. In all events, neither *Rovner* nor *Cal-Maine* demand that the court adopt a *quantum meruit* approach in these circumstances.  Last, Defendants cite *Dann v. Chrysler Corp.*, 215 A.2d 709, 714 (Del. Ch. 1965), for the proposition that the court must "net the claimed benefit against potential costs to Tesla as an entity (or to the stockholders)."  Defs.' Ans. Fee Br. at 42.  There, the court struggled to ascertain the "net benefit" where the defendant agreed to amend an employee compensation plan,

Even if a *quantum meruit* approach made sense, a 4x multiplier would not. Defendants barely defend their 4x proposal. They provide a table of rulings in *quantum meruit* cases and identify the multiples associated with each case.[341] They also cite an affidavit submitted by a stockholder from University of Michigan Law Professor Adam Pritchard, who opined that in federal securities litigation, one of the law firms that represented Plaintiff in this suit "routinely take[s] on higher risk cases, involving substantially greater investment, to earn fees at an average lodestar of about 1.5x, and rarely in excess of 3x."[342]

The cases in Defendants' chart offer little insight into the reasoning behind their proposed multiplier. Of the 19 cases referenced, five list the multiplier as "unknown."[343] The others range from 0.526 to 2.99.[344] The 2.99 multiplier closest to Defendants' proposed 4x is from *Cheniere*.[345] Among the factors to consider in selecting a fee multiplier are the time, risk, and results associated with litigation.[346] *Cheniere* went from complaint to fee ruling in less than a year, and the lodestar figure

which resulted in a "long-range benefit to [the company] in aiding it to acquire and retain highly qualified personnel in a very competitive industry." 215 A.2d at 716. The court adopted a *quantum meruit* approach to awarding fees in light of the uncertainties. Unlike in *Chrysler*, this case did not settle, and the benefit is quantifiable.

[341] Defs.' Ans. Fee Br., Ex. A (*Quantum Meruit* Cases Chart).

[342] Defs.' Ans. Fee Br. at 50 (citing Pritchard Aff. ¶¶ 10–15).

[343] Defs.' Ans. Fee Br., Ex. A.

[344] *Id.*

[345] *Id.* at A-1.

[346] *See* 5 William B. Rubenstein et al., *Newberg and Rubenstein on Class Actions* § 15:87 (6th ed. 2024) ("Newberg & Rubenstein").

was calculated based on 3,036 hours of work.[347]  Here, Plaintiff's counsel logged 6.4x as many hours over the course of six years. [348]  As to risk, all else being equal, Plaintiff's counsel was dealt the added threat of litigating, on a contingent basis, against a defendant that publicly declared his "commitment" to "never surrender/settle" a case that he felt was unjust.[349]  Results-wise, Plaintiff's counsel successfully secured the rescission of the largest compensation package ever granted, a far cry from the outcome in *Cheniere*.[350]  These factors suggest a multiple greater than *Cheniere*'s 2.99x is appropriate.  Yet Defendants offer no reason for their modest increase to 4x.

The federal fee multipliers offer no firmer ground for Defendants' position. Defendants do not explain why the court should limit its sample set to only those cases previously litigated by the law firms representing Plaintiff in this this case (much less only one of those three firms).  Expanding the scope is informative, as courts in federal securities cases have awarded multipliers far heftier than the 4x

---

[347] The complaint was filed May 29, 2014, and the court gave its ruling as to fees on March 16, 2015.  *Compare In re Cheniere Energy Inc. S'holders Litig.*, C.A. No. 9766-VCL, Dkt. 1. *with id.* at Dkt. 75 (Order and Final Judgment); *see also id.* at Dkt. 68, Ex. 5 (Summary of Plaintiffs' Counsel's Hours, Lodestar and Expenses).

[348] *See* Andrews Aff. ¶¶ 4–5; Friedman Aff. ¶¶ 4–5; Van Kwawegen Aff. ¶¶ 7–10.

[349] Elon Musk (@elonmusk), X f/k/a Twitter (May 20, 2022, 1:34 PM), https://x.com/elonmusk/status/1527749734668050433?lang=en.

[350] *Compare In re Cheniere Energy Inc. S'holders Litig.*, C.A. No. 9710-VCL, Dkt. 1 at Prayer For Relief (requesting that the court invalidate a challenged vote that resulted in an increase in the company's share plan reserve for the purpose of using the stock as compensation and the disgorgement of all compensation distributed as a result) *with Cheniere Settlement* at 93:19–96:7 (describing the settlement consideration and noting that as part of the settlement, all existing stock awards and all common stock issued or to be issued in connection with those awards were validated).

Defendants propose.[351] Moreover, Chancery litigation is unlike much else, including federal securities litigation.[352] In this court, plaintiffs' counsel faces "far higher rates of dismissal, far lower prospects of settlement, and far smaller potential recoveries."[353] Adequately accounting for the steeper grade Chancery plaintiffs face on the road to litigative success calls for something beyond "the presumptive ceiling" of federal fee multipliers, and therefore, beyond the 4x Defendants propose.

In selecting a 4x multiplier, Defendants ignore more relevant precedent. In *Americas Mining*, for example, a minority stockholder brought derivative claims on behalf of a mining company alleging the company purchased its controlling stockholder's interest in a Mexican mining business at an unfair price.[354] The plaintiff prevailed, and the high court affirmed the Chancery decision awarding a judgment of $2.0316 billion and attorneys' fees and expenses in the amount of 15% of

---

[351] *See Dell Chancery*, 300 A.3d at 715 n.26 (citing *Farrell v. Bank of Am. Corp., N.A.*, 827 F. App'x 628, 630 (9th Cir. 2020) (10.15x multiplier); *Kane Cnty., Utah v. United States*, 145 Fed. Cl. 15, 19–20 (Fed. Cl. 2019) (6.13x multiplier; collecting cases approving or referencing multipliers between 5.39x to 19.6x); *In re Doral Fin. Corp. Sec. Litig.*, No. 05-MDL-1706 (S.D.N.Y. July 17, 2007) (Dkt. 107) (10.26x multiplier); *New Eng. Carpenters Health Benefits Fund v. First Databank, Inc.*, 2009 WL 2408560, at *2 (D. Mass. Aug. 3, 2009) (8.3x multiplier); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, 2005 WL 1213926, at *18 (E.D. Pa. May 19, 2005) (15.6x multiplier); *In re Merry-Go-Round Enters., Inc.*, 244 B.R. 327, 337–38 (Bankr. D. Md. 2000) (19.6x multiplier); *Conley v. Sears, Roebuck & Co.*, 222 B.R. 181, 182 (D. Mass. 1998) (8.9x multiplier)).

[352] *See Dell Appeal,* 2024 WL 3811075, at *8–9.

[353] *Dell Chancery*, 300 A.3d at 708.

[354] *In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761 (Del. Ch. 2011), *aff'd sub nom. Americas Mining Corp. v. Theriault,* 51 A.3d 1213 (Del. 2012).

the total judgment, or $304 million.[355]  That fee award reflected a lodestar multiplier

of approximately 66x.[356]  When affirming the award, the Delaware Supreme Court

stated that the litigation resulted in an "extraordinary benefit" to the company, which

"merits a very substantial award of attorneys' fees."[357]

The unflinching willingness of the Delaware Supreme Court to affirm an

award bearing a 66x lodestar multiple and the likeness of this action to *Americas*

*Mining* counsel against Defendants' approach.

Moreover, awarding fees at 4x the lodestar for rescinding the largest

compensation plan in history would severely disincentivize challenges to

compensation plans in Delaware, no matter how egregious and unfair.  It would

minimize the deterrent effect of private suits and leave controllers with a road map

for tunnelling.  That is the opposite of what Delaware law seeks to do.  Defendants'

approach would thus run contrary to sound policy.

For the reasons stated above, *quantum meruit* is a poor fit for calculating the

fee award in this case, and thus the court does not apply it.

### c.    The GDFV Argument

That leaves Defendants' fallback argument—the GDFV approach.  GDFV is

calculated based on Accounting Standards Codification ("ASC") established by the

Financial Accounting Standards Board ("FASB"), which is generally recognized as an

---

[355] *Americas Mining*, 51 A.3d at 1218.

[356] *Id.* at 1252 (awarding plaintiff's counsel "66 times the value of their time and expenses").

[357] *Id.* at 1255.

authoritative source on Generally Accepted Accounting Principles. Under ASC 718, companies recognize the fair value of equity-based compensation awards in their financial statements, generally beginning on the date the awards are granted.

As Professor Taylor explained,

> the GDFV represents the historical cost of a compensation grant as of a particular point in time, *i.e.*, the grant date. It does not reflect subsequent changes in market conditions. Just like a receipt showing I paid $2.15 for a large coffee indicates the historical cost I paid for the coffee, GDFV indicates the historical cost to Tesla of the [Grant].[358]

GDFV is recorded as an accounting expense when grant options have vested. When recorded as an accounting expense, the GDFV reduces a company's net income. Rescission thus generally reverses this expense and increases a company's net income by the amount of the previously recorded expense.[359]

In connection with the Grant, Tesla recognized an accounting charge in the amount of the Grant's GDFV of approximately $2.3 billion.[360] Rescission reversed that charge, increasing Tesla's net income by $2.3 billion.[361]

Relying on GDFV as a valuation metric offers many benefits. GDFV is based on standards of financial accounting established by FASB, an independent non-profit that provides "decision-useful information to investors" and is recognized as

---

[358] Taylor Aff. ¶ 20.

[359] *Id.* at ¶ 21.

[360] Fischel Decl. ¶ 8 n.17 ("In connection with the Grant, Tesla included a charge of approximately $2.3 billion in its financial statements[.]").

[361] Taylor Aff. ¶ 25.

authoritative by the SEC and other institutions.[362]  All else equal, these features promote transparency, predictability, and reliability.  Using GDFV as a valuation metric also goes a long way in this case toward eliminating the windfall problem.  At $2.3 billion, the *Americas Mining* percentages of 10% to 33% generate a presumptive fee range of $253 million to $759 million.  These numbers are a lot closer to precedent fee awards than Plaintiff's request.  Moreover, it is hard for Defendants to argue against the GDFV approach (although they try), because they adopted it when settling parallel litigation challenging Tesla director compensation.[363]

Relying on GDFV, however, also generates problems.  First, although ASC guidance aims to provide decision-useful information, some have criticized the FASB's standards-setting process as overly politicized.[364]  Plus, accounting rules are not necessarily designed to track changes in economic value,[365] and reasonable minds

---

[362] Financial Accounting Standards Board, https://www.fasb.org (last visited Nov. 24, 2024).

[363] *See The Police and Fire Retirement Sys. of the City of Detroit v. Elon Musk, et. al*, C.A. No. 2020-0477-KSJM, Dkt. 157 (Tesla's Answering Brief in Opposition to Plaintiff's Request for Award of Attorneys' Fees and Expenses) at 9–10.

[364] *See* Gipper, Lombardi & Skinner, *The Politics of Standard-Setting: A Review of Empirical Research* (Stan. Grad. Sch. Bus., Working Paper No. 3441, Oct. 17, 2013), at Abstract, https://www.gsb.stanford.edu/faculty-research/working-papers/politics-accounting-standard-setting-review-empirical-research (criticizing the process by which ASC guidance is developed as overly politicized and providing an overview of the empirical literature on the politics of accounting standard setting by the FASB); *id.* at 39–40 ("[p]erhaps the best known . . . example of political interference in standard-setting was the tremendous political pressure" applied by Congress when the FASB proposed a rule requiring firms to expense the value of employee stock options, which led the FASB to "compromise" and issue a revised final rule); *see also* Skinner Dep. Tr. at 297:4–22, 298:5–300:6.

[365] Bebchuk & Jackson Decl. ¶ 65.

have expressed doubt as to whether GDFV accounting charges reflect economic reality.[366]  Defendants themselves acknowledged that the GDFV is "flawed as a measure of value."[367]

As troubling, GDFV is an *ex-ante* approach and thus runs the risk of promoting bad incentives.[368]  If GDFV were the exclusive measure, then stockholder representatives would have little incentive to challenge compensation awards where the GDFV is of little or no value, even where the intrinsic value of the vested options became significant.  Similarly, where a GDFV has considerable value, a stockholder representative has significant incentive to challenge the compensation award even where the intrinsic value of the vested options is nil.

These problems make GDFV a bad candidate for a default rule, but they are not dispositive in the exceptional case.  This is that case.  The $2.3 billion GDFV provided ample incentive for a stockholder representative to challenge the Grant, which had a greater actual value to both Musk and Tesla's stockholder and had considerable intrinsic value to Musk at the time it vested.  Thus, the incentives worked in this case as they ought.

---

[366] *See id.* at ¶ 63 ("It is widely accepted that changes in accounting figures are not generally accompanied by equivalent changes in economic value." (collecting authorities)).

[367] Dkt. 227 (Director Defendants' Pretrial Brief) at 56–57.

[368] *See supra* § III.A.1.b(iii).

### 3. Conclusion Regarding The Primary *Sugarland* Factor

Summing it up, Plaintiff's reverse-dilution theory is a theoretically sound approach to valuing rescission, but it generates an insurmountable windfall problem. Each of the alternatives proffered by Defendants have issues, but the GDFV approach is the least problematic given the unique circumstances of this case. The court therefore adopts the GDFV approach, conservatively valuing the benefit of rescission at $2.3 billion.

There is justification for awarding Plaintiff's counsel 33% of the $2.3 billion, which would result in a fee award of $759 million. But that would be the highest award in the history of Delaware litigation by a wide margin.[369] And so yet a further adjustment is required to avoid the windfall issue. Following Plaintiff's lead, the court adopts the 15% baseline of *Americas Mining*. Atop that, Plaintiff applied a "liquidity discount" to reach 11%, but the liquidity discount seemed like a results-driven exercise designed to reach a more reasonable number when Plaintiff's starting point was a $54.5 billion valuation. Also, the liquidity discount assumed that the court would require payment in shares, which this decision does not do. A liquidity discount does not make sense here. The more appropriate figure is 15%. Applying that percentage to $2.3 billion, the fee award resulting from the primary *Sugarland* factor is $345,000,000.

---

[369] *See, e.g., Americas Mining*, 51 A.3d at 1252 (affirming trial court decision awarding counsel $304 million in fees); *Dell Appeal*, 2024 WL 3811075, at *4–13 (affirming trial court decision awarding counsel $266.7 million in fees).

## B. The Secondary *Sugarland* Factors

The remaining *Sugarland* factors are: the time and effort of counsel; the relative complexities of the litigation; any contingency factor; and the standing and ability of counsel. Although these factors "may cause the court to adjust the indicative fee up or down," they do not warrant an adjustment in this case.[370]

Plaintiff's counsel's time and efforts were substantial. From the action's inception through the date of the Post-Trial Opinion, Plaintiff's counsel collectively logged 19,499.95 hours amounting to $13,624,462.75 in lodestar.[371] A $345 million award, therefore, represents a 25.3 multiplier. In *Americas Mining*, the Supreme Court held that a fee award with a lodestar multiplier over twice as high was not excessive.[372] Additionally, Plaintiff's counsel litigated the action efficiently, and to great success. They overcame every hurdle they faced: completing a books-and-record investigation pursuant to Section 220; defeating a motion to dismiss, which involved novel arguments and called for supplemental submissions; navigating the COVID-19 pandemic to engage in substantial discovery efforts; undertaking extensive document discovery; propounding and responding to extensive written discovery; serving discovery on twelve third parties; taking 17 fact depositions and defending one; presenting three experts and defending their depositions; taking three depositions of Defendants' experts; amending their complaint; litigating cross-motions for summary

---

[370] *Dell Chancery*, 300 A.3d at 692.

[371] *See* Andrews Aff. ¶¶ 4–5; Friedman Aff. ¶¶ 4–5; Van Kwawegen Aff. ¶¶ 7–10. This translates to one person working 24 hours a day, seven days a week, for 2.2 years.

[372] *Americas Mining*, 51 A.3d at 1252.

judgment; trying the case; and preparing post-trial briefing, post-trial oral argument, and supplemental post-trial briefing. And Plaintiff's counsel has invested significant additional effort since the Post-Trial Opinion defending its outcome and no doubt will be required to continue through appeal.

The action was complex. Plaintiff faced some of the best law firms in the country, who put Plaintiff through their paces. The trial record was extensive. And the action presented difficult substantive issues. For example, Plaintiff had to piece together what transpired in a transaction process involving a close-knit group of Musk loyalists, and in which Tesla's General Counsel, Maron—whose involvement gave rise to privilege claims over relevant documents—was "a primary go-between Musk and the committee."[373] Plaintiff also faced significant complexity from technical accounting issues that required retaining an accounting expert. Plaintiff had to formulate a damages theory with respect to an unprecedented compensation award as to which nobody had undertaken any benchmarking that might illuminate what would constitute a fair price. The action's complexity fully supports the $345 million fee award.

Plaintiff's counsel assumed a massive contingency risk. The contingent nature of the litigation is the "second most important factor considered by this Court in awarding the counsel fee[.]"[374] "It is the 'public policy of Delaware to reward risk-

---

[373] Post-Trial Op., 310 A.3d at 446.

[374] *Dow Jones & Co. v. Shields*, 1992 WL 44907, at *2 (Del. Ch. Jan. 10, 1992).

taking in the interests of shareholders."[375]  Thus, "[t]his Court has recognized that an attorney may be entitled to a much larger fee when the compensation is contingent than when it is fixed on an hourly or contractual basis."[376]  "Accepting contingency risk is what enables counsel to receive an award based on the results generated by the litigation that exceeds their lodestar."[377]  Plaintiff's counsel litigated this action on a fully contingent basis.  If they lost, they would get nothing.  They were responsible for funding their out-of-pocket expenses, which were significant.  And litigating this action required the allocation of a substantial amount of Plaintiff's counsel's time and resources over six years.[378]  Compounding this risk, Plaintiff knew that Musk does not typically settle cases[379] and that his attorneys would not hold back.[380]  "The true contingency risk in this case supports a results-based award using the *Americas Mining* percentages."[381]

---

[375] *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1073 (Del. Ch. 2015) (quoting *In re Plains Res. Inc.*, 2005 WL 332811, at *6 (Del. Ch. Feb. 4, 2005)).

[376] *Ryan v. Gifford*, 2008 WL 18143, at *13 (Del. Ch. Jan. 2, 2009).

[377] *Dell Chancery*, 300 A.3d at 726.

[378] *See Kurz v. Holbrook*, C.A. No. 5019-VCL, Dkt. 260 at 32:18–21 (Del. Ch. July 19, 2010) (TRANSCRIPT) (noting that the plaintiff's counsel "went all-in on a concentrated bet, where they invested a material amount of their firm's resources to get an outcome").

[379] *See* Pl.'s Opening Fee Br. at 29 (first citing *In re Tesla, Inc. Sec. Litig.*, No. 3:18-cv-04865 (N.D. Cal.), then *Unsworth v. Musk*, No. 2:18-cv-08048 (C.D. Cal.), and then *In re Tesla Motors, Inc. S'holder Litig.*, 2023 WL 3854008 (Del. 2023)).

[380] *See Dell Chancery*, 300 A.3d at 726 (noting that the plaintiff's counsel "did not enter the case with a ready-made exit or obvious settlement opportunity" and "[t]here was a serious possibility that plaintiff's counsel would lose and receive nothing").

[381] *Id.*

Plaintiff's counsel's standing and ability support the fee. They are experienced stockholder advocates who have secured some of the largest recoveries in the court's history and successfully taken high-stakes cases through trial and appeal. They also litigated against all-star teams from multiple top-ranked firms, who were supremely motivated to prevail in this astronomically high-stakes and high-profile case, further supporting this factor.

The secondary *Sugarland* factors all support the $345 million fee award.

## C. Form Of Payment

Plaintiff's counsel asked to be paid in freely tradeable Tesla common stock, observing that this approach hews most closely to the benefit achieved.[382] Plaintiff also argues that this approach benefits Tesla in two ways. First, it frees Tesla from any obligation to make a large payment from its cash on hand. Second, as University of Virginia School of Law Professor Ethan Yale opined, it could entitle Tesla to a tax benefit that can be recognized either now or at some future date of up to 21% of the value of any Tesla shares provided to Plaintiff's counsel.[383]

Defendants oppose paying fees in Tesla shares. They note that no case cited by Plaintiff *required* the issuer to pay attorney's fees in shares over the defendant's objection; in each, the issuer agreed to this outcome.[384] Based on its unprecedented

---

[382] Pl.'s Opening Fee Br. at 16.

[383] Yale Aff. ¶¶ 13–15.

[384] *See* Pl.'s Opening Fee Br. at 17–18 (citing *Sanders v. Wang*, 2000 WL 35572084, at ¶ 12 (Del. Ch. June 22, 2000) (approving settlement and fee request where issuer agreed to pay fees in stock as part of a settlement); *Americas Mining*, 51 A.3d at 1262–

nature alone, Defendants argue that the court should deny Plaintiff's request. (Were that how this court treated unprecedented positions, then this decision could have made far quicker work of the Ratification Argument.) Defendants also argue that delivering shares to Plaintiff or his counsel would require ordering Tesla to register and issue new shares—a mandatory injunction that Plaintiff has not proven up.

Defendants make other arguments too, but this decision is already long enough. Perhaps there is a case in which requiring a defendant to pay attorney's fees in shares over the defendant's objection is appropriate and just. But Defendants win on this point for a simple reason: Plaintiff's most compelling argument for payment in shares is that this form of payment benefits Tesla. Tesla does not see it as a benefit. So, the court will not force it. It is up to Defendants. They may elect to pay the fee award in freely tradeable shares or in cash.

## IV. CONCLUSION

Defendants' Motion to Revise is denied. Plaintiff's counsel is awarded fees in the amount of $345,000,000, which Tesla may elect to pay in freely tradeable Tesla common stock. Plaintiff's fee award is inclusive of Plaintiff's expenses of $1,120,115.50[385] and costs of $325,684.07.[386]

---

63 (affirming decision granting controller the option of paying judgment by returning stock and ordering attorney's fees to be paid in cash)).

[385] Pl.'s Opening Fee Br. at 12.

[386] Dkt. 310 (Pl.'s Bill of Costs).